# THE FLORIDA STAR *v.* B. J. F.

APPEAL FROM THE DISTRICT COURT OF APPEAL OF FLORIDA,
FIRST DISTRICT

No. 87–329.   Argued March 21, 1989—Decided June 21, 1989

*George K. Rahdert* argued the cause and filed briefs for appellant.

*Joel D. Eaton* argued the cause and filed a brief for appellee.\*

JUSTICE MARSHALL delivered the opinion of the Court.

Florida Stat. § 794.03 (1987) makes it unlawful to "print, publish, or broadcast . . . in any instrument of mass communication" the name of the victim of a sexual offense.[1] Pursuant to this statute, appellant The Florida Star was found civilly liable for publishing the name of a rape victim which it had obtained from a publicly released police report. The issue presented here is whether this result comports with the First Amendment. We hold that it does not.

I

The Florida Star is a weekly newspaper which serves the community of Jacksonville, Florida, and which has an average circulation of approximately 18,000 copies. A regular feature of the newspaper is its "Police Reports" section.

_____

\*Briefs of *amici curiae* urging reversal were filed for the American Newspaper Publishers Association et al. by *Richard J. Ovelmen, W. Terry Maguire, Gary B. Pruitt, Paul J. Levine, Laura Besvinick,* and *Gregg D. Thomas;* and for the Reporters Committee for Freedom of the Press et al. by *Jane E. Kirtley, Robert J. Brinkmann,* and *J. Laurent Scharff.*

*Ronald A. Zumbrun* and *Anthony T. Caso* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

[1] The statute provides in its entirety:

"Unlawful to publish or broadcast information identifying sexual offense victim.—No person shall print, publish, or broadcast, or cause or allow to be printed, published, or broadcast, in any instrument of mass communication the name, address, or other identifying fact or information of the victim of any sexual offense within this chapter. An offense under this section shall constitute a misdemeanor of the second degree, punishable as provided in § 775.082, § 775.083, or § 775.084." Fla. Stat. § 794.03 (1987).

That section, typically two to three pages in length, contains brief articles describing local criminal incidents under police investigation.

On October 20, 1983, appellee B. J. F.[2] reported to the Duval County, Florida, Sheriff's Department (Department) that she had been robbed and sexually assaulted by an unknown assailant. The Department prepared a report on the incident which identified B. J. F. by her full name. The Department then placed the report in its pressroom. The Department does not restrict access either to the pressroom or to the reports made available therein.

A Florida Star reporter-trainee sent to the pressroom copied the police report verbatim, including B. J. F.'s full name, on a blank duplicate of the Department's forms. A Florida Star reporter then prepared a one-paragraph article about the crime, derived entirely from the trainee's copy of the police report. The article included B. J. F.'s full name. It appeared in the "Robberies" subsection of the "Police Reports" section on October 29, 1983, one of 54 police blotter stories in that day's edition. The article read:

> "[B. J. F.] reported on Thursday, October 20, she was crossing Brentwood Park, which is in the 500 block of Golfair Boulevard, enroute to her bus stop, when an unknown black man ran up behind the lady and placed a knife to her neck and told her not to yell. The suspect then undressed the lady and had sexual intercourse with her before fleeing the scene with her 60 cents, Timex watch and gold necklace. Patrol efforts have been suspended concerning this incident because of a lack of evidence."

---

[2] In filing this lawsuit, appellee used her full name in the caption of the case. On appeal, the Florida District Court of Appeal *sua sponte* revised the caption, stating that it would refer to the appellee by her initials, "in order to preserve [her] privacy interests." 499 So. 2d 883, 883, n. (1986). Respecting those interests, we, too, refer to appellee by her initials, both in the caption and in our discussion.

In printing B. J. F.'s full name, The Florida Star violated its internal policy of not publishing the names of sexual offense victims.

On September 26, 1984, B. J. F. filed suit in the Circuit Court of Duval County against the Department and The Florida Star, alleging that these parties negligently violated § 794.03. See n. 1, *supra*. Before trial, the Department settled with B. J. F. for $2,500. The Florida Star moved to dismiss, claiming, *inter alia*, that imposing civil sanctions on the newspaper pursuant to § 794.03 violated the First Amendment. The trial judge rejected the motion. App. 4.

At the ensuing daylong trial, B. J. F. testified that she had suffered emotional distress from the publication of her name. She stated that she had heard about the article from fellow workers and acquaintances; that her mother had received several threatening phone calls from a man who stated that he would rape B. J. F. again; and that these events had forced B. J. F. to change her phone number and residence, to seek police protection, and to obtain mental health counseling. In defense, The Florida Star put forth evidence indicating that the newspaper had learned B. J. F.'s name from the incident report released by the Department, and that the newspaper's violation of its internal rule against publishing the names of sexual offense victims was inadvertent.

At the close of B. J. F.'s case, and again at the close of its defense, The Florida Star moved for a directed verdict. On both occasions, the trial judge denied these motions. He ruled from the bench that § 794.03 was constitutional because it reflected a proper balance between the First Amendment and privacy rights, as it applied only to a narrow set of "rather sensitive . . . criminal offenses." App. 18–19 (rejecting first motion); see *id.*, at 32–33 (rejecting second motion). At the close of the newspaper's defense, the judge granted B. J. F.'s motion for a directed verdict on the issue of negligence, finding the newspaper *per se* negligent based upon its

violation of § 794.03. *Id.*, at 33. This ruling left the jury to consider only the questions of causation and damages. The judge instructed the jury that it could award B. J. F. punitive damages if it found that the newspaper had "acted with reckless indifference to the rights of others." *Id.*, at 35. The jury awarded B. J. F. $75,000 in compensatory damages and $25,000 in punitive damages. Against the actual damages award, the judge set off B. J. F.'s settlement with the Department.

The First District Court of Appeal affirmed in a three-paragraph *per curiam* opinion. 499 So. 2d 883 (1986). In the paragraph devoted to The Florida Star's First Amendment claim, the court stated that the directed verdict for B. J. F. had been properly entered because, under § 794.03, a rape victim's name is "of a private nature and not to be published as a matter of law." *Id.*, at 884, citing *Doe* v. *Sarasota-Bradenton Florida Television Co.*, 436 So. 2d 328, 330 (Fla. App. 1983) (footnote omitted).[3] The Supreme Court of Florida denied discretionary review.

The Florida Star appealed to this Court.[4] We noted probable jurisdiction, 488 U. S. 887 (1988), and now reverse.

---

[3] In *Doe* v. *Sarasota-Bradenton Florida Television Co.*, 436 So. 2d, at 329, the Second District Court of Appeal upheld the dismissal on First Amendment grounds of a rape victim's damages claim against a Florida television station which had broadcast portions of her testimony at her assailant's trial. The court reasoned that, as in *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975), the information in question "was readily available to the public, through the vehicle of a public trial." 436 So. 2d, at 330. The court stated, however, that § 794.03 could constitutionally be applied to punish publication of a sexual offense victim's name or other identifying information where it had not yet become "part of an open public record" by virtue of being revealed in "open, public judicial proceedings." *Ibid.*, citing Fla. Op. Atty. Gen. 075–203 (1975).

[4] Before noting probable jurisdiction, we certified to the Florida Supreme Court the question whether it had possessed jurisdiction when it declined to hear the newspaper's case. 484 U. S. 984 (1987). The State Supreme Court answered in the affirmative. 530 So. 2d 286, 287 (1988).

## II

The tension between the right which the First Amendment accords to a free press, on the one hand, and the protections which various statutes and common-law doctrines accord to personal privacy against the publication of truthful information, on the other, is a subject we have addressed several times in recent years. Our decisions in cases involving government attempts to sanction the accurate dissemination of information as invasive of privacy, have not, however, exhaustively considered this conflict. On the contrary, although our decisions have without exception upheld the press' right to publish, we have emphasized each time that we were resolving this conflict only as it arose in a discrete factual context.[5]

The parties to this case frame their contentions in light of a trilogy of cases which have presented, in different contexts, the conflict between truthful reporting and state-protected privacy interests. In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975), we found unconstitutional a civil damages award entered against a television station for broadcasting the name of a rape-murder victim which the station had obtained from courthouse records. In *Oklahoma Publishing*

---

[5] The somewhat uncharted state of the law in this area thus contrasts markedly with the well-mapped area of defamatory falsehoods, where a long line of decisions has produced relatively detailed legal standards governing the multifarious situations in which individuals aggrieved by the dissemination of damaging untruths seek redress. See, *e. g., New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); *Garrison* v. *Louisiana*, 379 U. S. 64 (1964); *Henry* v. *Collins*, 380 U. S. 356 (1965); *Rosenblatt* v. *Baer*, 383 U. S. 75 (1966); *Time, Inc.* v. *Hill*, 385 U. S. 374 (1967); *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6 (1970); *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265 (1971); *Time, Inc.* v. *Pape*, 401 U. S. 279 (1971); *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974); *Herbert* v. *Lando*, 441 U. S. 153 (1979); *Hutchinson* v. *Proxmire*, 443 U. S. 111 (1979); *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749 (1985); *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242 (1986).

*Co.* v. *Oklahoma County District Court,* 430 U. S. 308 (1977), we found unconstitutional a state court's pretrial order enjoining the media from publishing the name or photograph of an 11-year-old boy in connection with a juvenile proceeding involving that child which reporters had attended. Finally, in *Smith* v. *Daily Mail Publishing Co.,* 443 U. S. 97 (1979), we found unconstitutional the indictment of two newspapers for violating a state statute forbidding newspapers to publish, without written approval of the juvenile court, the name of any youth charged as a juvenile offender. The papers had learned about a shooting by monitoring a police band radio frequency and had obtained the name of the alleged juvenile assailant from witnesses, the police, and a local prosecutor.

Appellant takes the position that this case is indistinguishable from *Cox Broadcasting.* Brief for Appellant 8. Alternatively, it urges that our decisions in the above trilogy, and in other cases in which we have held that the right of the press to publish truth overcame asserted interests other than personal privacy,[6] can be distilled to yield a broader First Amendment principle that the press may never be punished, civilly or criminally, for publishing the truth. *Id.,* at 19. Appellee counters that the privacy trilogy is inapposite, because in each case the private information already appeared on a "public record," Brief for Appellee 12, 24, 25, and because the privacy interests at stake were far less profound than in the present case. See, *e. g., id.,* at 34. In the alternative, appellee urges that *Cox Broadcasting* be overruled and replaced with a categorical rule that publication of the

---

[6] See, *e. g., Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829 (1978) (interest in confidentiality of judicial disciplinary proceedings); *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977) (interest in maintaining professionalism of attorneys); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976) (interest in accused's right to fair trial); *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976) (interest in maintaining professionalism of licensed pharmacists); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971) (interest in national security); *Garrison, supra* (interest in public figure's reputation).

name of a rape victim never enjoys constitutional protection. Tr. of Oral Arg. 44.

We conclude that imposing damages on appellant for publishing B. J. F.'s name violates the First Amendment, although not for either of the reasons appellant urges. Despite the strong resemblance this case bears to *Cox Broadcasting*, that case cannot fairly be read as controlling here. The name of the rape victim in that case was obtained from courthouse records that were open to public inspection, a fact which JUSTICE WHITE's opinion for the Court repeatedly noted. 420 U. S., at 492 (noting "special protected nature of accurate reports of *judicial* proceedings") (emphasis added); see also *id.*, at 493, 496. Significantly, one of the reasons we gave in *Cox Broadcasting* for invalidating the challenged damages award was the important role the press plays in subjecting trials to public scrutiny and thereby helping guarantee their fairness. *Id.*, at 492–493.[7] That role is not directly compromised where, as here, the information in question comes from a police report prepared and disseminated at a time at which not only had no adversarial criminal proceedings begun, but no suspect had been identified.

Nor need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment. Our cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily. See, *e. g.*, *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931) (hypothesizing "publication of the sailing dates of transports or the number and location of troops"); see also *Garrison* v. *Louisiana*, 379 U. S. 64, 72,

---

[7] We also recognized that privacy interests fade once information already appears on the public record, 420 U. S., at 494–495, and that making public records generally available to the media while allowing their publication to be punished if offensive would invite "self-censorship and very likely lead to the suppression of many items that . . . should be made available to the public." *Id.*, at 496.

n. 8, 74 (1964) (endorsing absolute defense of truth "where discussion of public affairs is concerned," but leaving unsettled the constitutional implications of truthfulness "in the discrete area of purely private libels"); *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 838 (1978); *Time, Inc.* v. *Hill*, 385 U. S. 374, 383, n. 7 (1967). Indeed, in *Cox Broadcasting*, we pointedly refused to answer even the less sweeping question "whether truthful publications may ever be subjected to civil or criminal liability" for invading "an area of privacy" defined by the State. 420 U. S., at 491. Respecting the fact that press freedom and privacy rights are both "plainly rooted in the traditions and significant concerns of our society," we instead focused on the less sweeping issue "whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." *Ibid.* We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.

In our view, this case is appropriately analyzed with reference to such a limited First Amendment principle. It is the one, in fact, which we articulated in *Daily Mail* in our synthesis of prior cases involving attempts to punish truthful publication: "[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 443 U. S., at 103. According the press the ample protection provided by that principle is supported by at least three separate considerations, in addition to, of course, the overarching "'public interest, secured by the Constitution, in the dissemination of truth.'" *Cox Broad-*

*casting, supra,* at 491, quoting *Garrison, supra,* at 73 (footnote omitted). The cases on which the *Daily Mail* synthesis relied demonstrate these considerations.

First, because the *Daily Mail* formulation only protects the publication of information which a newspaper has "lawfully obtain[ed]," 443 U. S., at 103, the government retains ample means of safeguarding significant interests upon which publication may impinge, including protecting a rape victim's anonymity. To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired. To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts. See, *e. g., Landmark Communications, supra,* at 845 ("[M]uch of the risk [from disclosure of sensitive information regarding judicial disciplinary proceedings] can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings"); *Oklahoma Publishing,* 430 U. S., at 311 (noting trial judge's failure to avail himself of the opportunity, provided by a state statute, to close juvenile hearing to the public, including members of the press, who later broadcast juvenile defendant's name); *Cox Broadcasting, supra,* at 496 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which

avoid public documentation or other exposure of private information").[8]

A second consideration undergirding the *Daily Mail* principle is the fact that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act. It is not, of course, always the case that information lawfully acquired by the press is known, or accessible, to others. But where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release. We noted this anomaly in *Cox Broadcasting:* "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." 420 U. S., at 495. The *Daily Mail* formulation reflects the fact that it is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities, like the press. As *Daily Mail* observed in its summary of *Oklahoma Publishing*, "once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination." 443 U. S., at 103.

A third and final consideration is the "timidity and self-censorship" which may result from allowing the media to be punished for publishing certain truthful information. *Cox Broadcasting, supra,* at 496. *Cox Broadcasting* noted this concern with overdeterrence in the context of information made public through official court records, but the fear of ex-

---

[8] The *Daily Mail* principle does not settle the issue whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well. This issue was raised but not definitively resolved in *New York Times Co.* v. *United States,* 403 U. S. 713 (1971), and reserved in *Landmark Communications,* 435 U. S., at 837. We have no occasion to address it here.

cessive media self-suppression is applicable as well to other information released, without qualification, by the government. A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. This situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question.

Applied to the instant case, the *Daily Mail* principle clearly commands reversal. The first inquiry is whether the newspaper "lawfully obtain[ed] truthful information about a matter of public significance." 443 U. S., at 103. It is undisputed that the news article describing the assault on B. J. F. was accurate. In addition, appellant lawfully obtained B. J. F.'s name. Appellee's argument to the contrary is based on the fact that under Florida law, police reports which reveal the identity of the victim of a sexual offense are not among the matters of "public record" which the public, by law, is entitled to inspect. Brief for Appellee 17–18, citing Fla. Stat. § 119.07(3)(h) (1983). But the fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government. Nor does the fact that the Department apparently failed to fulfill its obligation under § 794.03 not to "cause or allow to be . . . published" the name of a sexual offense victim make the newspaper's ensuing receipt of this information unlawful. Even assuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step. It is, clear, furthermore, that the news article concerned "a matter of public significance," 443 U. S., at 103, in the sense in which the *Daily Mail* synthesis of prior cases used that term. That is, the article generally, as opposed to the specific identity contained within it, involved a

matter of paramount public import: the commission, and investigation, of a violent crime which had been reported to authorities. See *Cox Broadcasting, supra* (article identifying victim of rape-murder); *Oklahoma Publishing Co. v. Oklahoma County District Court,* 430 U. S. 308 (1977) (article identifying juvenile alleged to have committed murder); *Daily Mail, supra* (same); cf. *Landmark Communications, Inc. v. Virginia,* 435 U. S. 829 (1978) (article identifying judges whose conduct was being investigated).

The second inquiry is whether imposing liability on appellant pursuant to § 794.03 serves "a need to further a state interest of the highest order." *Daily Mail,* 443 U. S., at 103. Appellee argues that a rule punishing publication furthers three closely related interests: the privacy of victims of sexual offenses; the physical safety of such victims, who may be targeted for retaliation if their names become known to their assailants; and the goal of encouraging victims of such crimes to report these offenses without fear of exposure. Brief for Appellee 29–30.

At a time in which we are daily reminded of the tragic reality of rape, it is undeniable that these are highly significant interests, a fact underscored by the Florida Legislature's explicit attempt to protect these interests by enacting a criminal statute prohibiting much dissemination of victim identities. We accordingly do not rule out the possibility that, in a proper case, imposing civil sanctions for publication of the name of a rape victim might be so overwhelmingly necessary to advance these interests as to satisfy the *Daily Mail* standard. For three independent reasons, however, imposing liability for publication under the circumstances of this case is too precipitous a means of advancing these interests to convince us that there is a "need" within the meaning of the *Daily Mail* formulation for Florida to take this extreme step. Cf. *Landmark Communications, supra* (invalidating penalty on publication despite State's expressed interest in non-

dissemination, reflected in statute prohibiting unauthorized divulging of names of judges under investigation).

First is the manner in which appellant obtained the identifying information in question. As we have noted, where the government itself provides information to the media, it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech. That assumption is richly borne out in this case. B. J. F.'s identity would never have come to light were it not for the erroneous, if inadvertent, inclusion by the Department of her full name in an incident report made available in a pressroom open to the public. Florida's policy against disclosure of rape victims' identities, reflected in § 794.03, was undercut by the Department's failure to abide by this policy. Where, as here, the government has failed to police itself in disseminating information, it is clear under *Cox Broadcasting*, *Oklahoma Publishing*, and *Landmark Communications* that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity. See *supra*, at 534–535. Once the government has placed such information in the public domain, "reliance must rest upon the judgment of those who decide what to publish or broadcast," *Cox Broadcasting*, 420 U. S., at 496, and hopes for restitution must rest upon the willingness of the government to compensate victims for their loss of privacy and to protect them from the other consequences of its mishandling of the information which these victims provided in confidence.

That appellant gained access to the information in question through a government news release makes it especially likely that, if liability were to be imposed, self-censorship would result. Reliance on a news release is a paradigmatically "routine newspaper reporting techniqu[e]." *Daily Mail*, *supra*, at 103. The government's issuance of such a release, without qualification, can only convey to recipients that the

government considered dissemination lawful, and indeed expected the recipients to disseminate the information further. Had appellant merely reproduced the news release prepared and released by the Department, imposing civil damages would surely violate the First Amendment. The fact that appellant converted the police report into a news story by adding the linguistic connecting tissue necessary to transform the report's facts into full sentences cannot change this result.

A second problem with Florida's imposition of liability for publication is the broad sweep of the negligence *per se* standard applied under the civil cause of action implied from § 794.03. Unlike claims based on the common-law tort of invasion of privacy, see Restatement (Second) of Torts § 652D (1977), civil actions based on § 794.03 require no case-by-case findings that the disclosure of a fact about a person's private life was one that a reasonable person would find highly offensive. On the contrary, under the *per se* theory of negligence adopted by the courts below, liability follows automatically from publication. This is so regardless of whether the identity of the victim is already known throughout the community; whether the victim has voluntarily called public attention to the offense; or whether the identity of the victim has otherwise become a reasonable subject of public concern—because, perhaps, questions have arisen whether the victim fabricated an assault by a particular person. Nor is there a scienter requirement of any kind under § 794.03, engendering the perverse result that truthful publications challenged pursuant to this cause of action are less protected by the First Amendment than even the least protected defamatory falsehoods: those involving purely private figures, where liability is evaluated under a standard, usually applied by a jury, of ordinary negligence. See *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974). We have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake. See *Globe*

*Newspaper Co.* v. *Superior Court of Norfolk County,* 457
U. S. 596, 608 (1982) (invalidating state statute providing for
the categorical exclusion of the public from trials of sexual
offenses involving juvenile victims). More individualized
adjudication is no less indispensable where the State, seeking
to safeguard the anonymity of crime victims, sets its face
against publication of their names.

Third, and finally, the facial underinclusiveness of § 794.03
raises serious doubts about whether Florida is, in fact, serv-
ing, with this statute, the significant interests which appellee
invokes in support of affirmance. Section 794.03 prohibits
the publication of identifying information only if this informa-
tion appears in an "instrument of mass communication," a
term the statute does not define. Section 794.03 does not
prohibit the spread by other means of the identities of victims
of sexual offenses. An individual who maliciously spreads
word of the identity of a rape victim is thus not covered, de-
spite the fact that the communication of such information to
persons who live near, or work with, the victim may have
consequences as devastating as the exposure of her name to
large numbers of strangers. See Tr. of Oral Arg. 49–50
(appellee acknowledges that § 794.03 would not apply to
"the backyard gossip who tells 50 people that don't have to
know").

When a State attempts the extraordinary measure of pun-
ishing truthful publication in the name of privacy, it must
demonstrate its commitment to advancing this interest by ap-
plying its prohibition evenhandedly, to the smalltime dissem-
inator as well as the media giant. Where important First
Amendment interests are at stake, the mass scope of disclo-
sure is not an acceptable surrogate for injury. A ban on dis-
closures effected by "instrument[s] of mass communication"
simply cannot be defended on the ground that partial prohi-
bitions may effect partial relief. See *Daily Mail,* 443 U. S.,
at 104–105 (statute is insufficiently tailored to interest in pro-
tecting anonymity where it restricted only newspapers, not

the electronic media or other forms of publication, from identifying juvenile defendants); *id.*, at 110 (REHNQUIST, J., concurring in judgment) (same); cf. *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 229 (1987); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585 (1983). Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose.[9]

## III

Our holding today is limited. We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the State may protect the individual from intrusion by the press, or even that a State may never punish publication of the name of a victim of a sexual offense. We hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest is satisfactorily served by imposing liability under § 794.03 to appellant under the facts of this case. The decision below is therefore

*Reversed.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I think it sufficient to decide this case to rely upon the third ground set forth in the Court's opinion, *ante*, at 540 and this page: that a law cannot be regarded as protecting an in-

---

[9] Having concluded that imposing liability on appellant pursuant to § 794.03 violates the First Amendment, we have no occasion to address appellant's subsidiary arguments that the imposition of punitive damages for publication independently violated the First Amendment, or that § 794.03 functions as an impermissible prior restraint. See *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 101–102 (1979).

terest "of the highest order," *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 103 (1979), and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited. In the present case, I would anticipate that the rape victim's discomfort at the dissemination of news of her misfortune among friends and acquaintances would be at least as great as her discomfort at its publication by the media to people to whom she is only a name. Yet the law in question does not prohibit the former in either oral or written form. Nor is it at all clear, as I think it must be to validate this statute, that Florida's general privacy law would prohibit such gossip. Nor, finally, is it credible that the interest meant to be served by the statute is the protection of the victim against a rapist still at large—an interest that arguably would extend only to mass publication. There would be little reason to limit a statute with that objective to rape alone; or to extend it to all rapes, whether or not the felon has been apprehended and confined. In any case, the instructions here did not require the jury to find that the rapist was at large.

This law has every appearance of a prohibition that society is prepared to impose upon the press but not upon itself. Such a prohibition does not protect an interest "of the highest order." For that reason, I agree that the judgment of the court below must be reversed.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

"Short of homicide, [rape] is the 'ultimate violation of self.'" *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (opinion of WHITE, J.). For B. J. F., however, the violation she suffered at a rapist's knifepoint marked only the beginning of her ordeal. A week later, while her assailant was still at large, an account of this assault—identifying by name B. J. F. as the victim—was published by The Florida Star. As a result, B. J. F. received harassing phone calls, required mental health counseling, was forced to move from

her home, and was even threatened with being raped again. Yet today, the Court holds that a jury award of $75,000 to compensate B. J. F. for the harm she suffered due to the Star's negligence is at odds with the First Amendment. I do not accept this result.

The Court reaches its conclusion based on an analysis of three of our precedents and a concern with three particular aspects of the judgment against appellant. I consider each of these points in turn, and then consider some of the larger issues implicated by today's decision.

## I

The Court finds its result compelled, or at least supported in varying degrees, by three of our prior cases: *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975); *Oklahoma Publishing Co.* v. *Oklahoma County District Court*, 430 U. S. 308 (1977); and *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97 (1979). I disagree. None of these cases requires the harsh outcome reached today.

*Cox Broadcasting* reversed a damages award entered against a television station, which had obtained a rape victim's name from public records maintained in connection with the judicial proceedings brought against her assailants. While there are similarities, critical aspects of that case make it wholly distinguishable from this one. First, in *Cox Broadcasting*, the victim's name had been disclosed in the hearing where her assailants pleaded guilty; and, as we recognized, judicial records have always been considered public information in this country. See *Cox Broadcasting, supra,* at 492–493. In fact, even the earliest notion of privacy rights exempted the information contained in judicial records from its protections. See Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 216–217 (1890). Second, unlike the incident report at issue here, which was meant by state law to be withheld from public release, the judicial pro-

ceedings at issue in *Cox Broadcasting* were open as a matter of state law. Thus, in *Cox Broadcasting*, the state-law scheme made public disclosure of the victim's name almost inevitable; here, Florida law forbids such disclosure. See Fla. Stat. 794.03 (1987).

These facts—that the disclosure came in judicial proceedings, which were open to the public—were critical to our analysis in *Cox Broadcasting*. The distinction between that case and this one is made obvious by the penultimate paragraph of *Cox Broadcasting*:

> "We are reluctant to embark on a course that would make *public records generally available to the media* but would forbid their publication if offensive . . . . [T]he First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information *released to the public in official court records. If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. . . .* Once true information is disclosed in *public court documents open to public inspection,* the press cannot be sanctioned for publishing it." *Cox Broadcasting, supra,* at 496 (emphasis added).

*Cox Broadcasting* stands for the proposition that the State cannot make the press its first line of defense in withholding private information from the public—it cannot ask the press to secrete private facts that the State makes no effort to safeguard in the first place. In this case, however, the State has undertaken "means which avoid [but obviously, not altogether prevent] public documentation or other exposure of private information." No doubt this is why the Court frankly admits that *"Cox Broadcasting . . .* cannot fairly be read as controlling here." *Ante,* at 532.

Finding *Cox Broadcasting* inadequate to support its result, the Court relies on *Smith* v. *Daily Mail Publishing Co.* as its

principal authority.[1]   But the flat rule from *Daily Mail* on which the Court places so much reliance—"[I]f a newspaper lawfully obtains truthful information . . . then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order"—was introduced in *Daily Mail* with the cautious qualifier that such a rule was "suggest[ed]" by our prior cases, "[n]one of [which] . . . directly control[led]" in *Daily Mail.* See *Daily Mail,* 443 U. S., at 103.   The rule the Court takes as a given was thus offered only as a hypothesis in *Daily Mail:* it should not be so uncritically accepted as constitutional dogma.

More importantly, at issue in *Daily Mail* was the disclosure of the name of the perpetrator of an infamous murder of a 15-year-old student.   *Id.,* at 99.   Surely the rights of those accused of crimes and those who are their victims must differ with respect to privacy concerns.   That is, whatever rights alleged criminals have to maintain their anonymity pending an adjudication of guilt—and after *Daily Mail,* those rights would seem to be minimal—the rights of crime victims to stay shielded from public view must be infinitely more substantial.   *Daily Mail* was careful to state that the "holding in this case is narrow . . . . *there is no issue here of privacy.*" *Id.,* at 105 (emphasis added).   But in this case, there is an issue of privacy—indeed, that is the principal issue—and therefore, this case falls outside of *Daily Mail*'s "rule"

---

[1] The second case in the "trilogy" which the Court cites is *Oklahoma Publishing Co.* v. *Oklahoma County District Court,* 430 U. S. 308 (1977). See *ante,* at 530–531.   But not much reliance is placed on that case, and I do not discuss it with the degree of attention devoted to *Cox Broadcasting* or *Daily Mail.*

As for the support *Oklahoma Publishing* allegedly provides for the Court's result here, the reasons that distinguish *Cox Broadcasting* and *Daily Mail* from this case are even more apt in the case of *Oklahoma Publishing.*   Probably that is why the Court places so little weight on this middle leg of the three.

(which, as I suggest above, was perhaps not even meant as a rule in the first place).

Consequently, I cannot agree that *Cox Broadcasting*, or *Oklahoma Publishing*, or *Daily Mail* requires — or even substantially supports — the result reached by the Court today.

## II

We are left, then, to wonder whether the three "independent reasons" the Court cites for reversing the judgment for B. J. F. support its result. See *ante*, at 537–541.

The first of these reasons relied on by the Court is the fact "appellant gained access to [B. J. F.'s name] through a government news release." *Ante*, at 538. "The government's issuance of such a release, without qualification, can only convey to recipients that the government considered dissemination lawful," the Court suggests. *Ante*, at 538–539. So described, this case begins to look like the situation in *Oklahoma Publishing*, where a judge invited reporters into his courtroom, but then tried to prohibit them from reporting on the proceedings they observed. But this case is profoundly different. Here, the "release" of information provided by the government was not, as the Court says, "without qualification." As the Star's own reporter conceded at trial, the crime incident report that inadvertently included B. J. F.'s name was posted in a room that contained signs making it clear that the names of rape victims were not matters of public record, and were not to be published. See 2 Record 113, 115, 117. The Star's reporter indicated that she understood that she "[was not] allowed to take down that information" (*i. e.*, B. J. F.'s name) and that she "[was] not supposed to take the information from the police department." *Id.*, at 117. Thus, by her own admission the posting of the incident report did not convey to the Star's reporter the idea that "the government considered dissemination lawful"; the Court's suggestion to the contrary is inapt.

Instead, Florida has done precisely what we suggested, in *Cox Broadcasting*, that States wishing to protect the privacy rights of rape victims might do: "respond [to the challenge] by means which *avoid* public documentation or other exposure of private information." 420 U. S., at 496 (emphasis added). By amending its public records statute to exempt rape victims names from disclosure, Fla. Stat. § 119.07(3)(h) (1983), and forbidding its officials to release such information, Fla. Stat. § 794.03 (1983), the State has taken virtually every step imaginable to prevent what happened here. This case presents a far cry, then, from *Cox Broadcasting* or *Oklahoma Publishing*, where the State asked the news media not to publish information it had made generally available to the public: here, the State is not asking the media to do the State's job in the first instance. Unfortunately, as this case illustrates, mistakes happen: even when States take measures to "avoid" disclosure, sometimes rape victims' names are found out. As I see it, it is not too much to ask the press, in instances such as this, to respect simple standards of decency and refrain from publishing a victim's name, address, and/or phone number.[2]

---

[2] The Court's concern for a free press is appropriate, but such concerns should be balanced against rival interests in a civilized and humane society. An absolutist view of the former leads to insensitivity as to the latter.

This was evidenced at trial, when the Florida Star's lawyer explained why the paper was not to blame for any anguish caused B. J. F. by a phone call she received, the day after the Star's story was published, from a man threatening to rape B. J. F. again. Noting that the phone call was received at B. J. F.'s home by her mother (who was babysitting B. J. F.'s children while B. J. F. was in the hospital), who relayed the threat to B. J. F., the Star's counsel suggested:

"[I]n reference to the [threatening] phone call, it is sort of blunted by the fact that [B. J. F.] didn't receive the phone call. Her mother did. And if there is any pain and suffering in connection with the phone call, it has to lay in her mother's hands. I mean, my God, she called [B. J. F.] up at the hospital to tell her [of the threat]—you know, I think that is tragic, but I

Second, the Court complains that appellant was judged here under too strict a liability standard. The Court contends that a newspaper might be found liable under the Florida courts' negligence *per se* theory without regard to a newspaper's scienter or degree of fault. *Ante*, at 539–540. The short answer to this complaint is that whatever merit the Court's argument might have, it is wholly inapposite here, where the jury found that appellant acted with "reckless indifference towards the rights of others," 2 Record 170, a standard far higher than the *Gertz* standard the Court urges as a constitutional minimum today. *Ante*, at 539–540. B. J. F. proved the Star's negligence at trial—and, actually, far more than simple negligence; the Court's concerns about damages resting on a strict liability or mere causation basis are irrelevant to the validity of the judgment for appellee.

But even taking the Court's concerns in the abstract, they miss the mark. Permitting liability under a negligence *per se* theory does not mean that defendants will be held liable without a showing of negligence, but rather, that the standard of care has been set by the legislature, instead of the courts. The Court says that negligence *per se* permits a plaintiff to hold a defendant liable without a showing that the disclosure was "of a fact about a person's private life . . . that a reasonable person would find highly offensive." *Ante*, at 539. But the point here is that the legislature—reflecting popular sentiment—has determined that disclosure of the fact that a person was raped is categorically a revelation that reasonable people find offensive. And as for the Court's suggestion that the Florida courts' theory permits liability without regard for whether the victim's identity is already

---

don't think that is something you can blame the Florida Star for." 2 Record 154–155.

While I would not want to live in a society where freedom of the press was unduly limited, I also find regrettable an interpretation of the First Amendment that fosters such a degree of irresponsibility on the part of the news media.

known, or whether she herself has made it known—these are facts that would surely enter into the calculation of damages in such a case. In any event, none of these mitigating factors was present here; whatever the force of these arguments generally, they do not justify the Court's ruling against B. J. F. in this case.

Third, the Court faults the Florida criminal statute for being underinclusive: § 794.03 covers disclosure of rape victim's names in "'instrument[s] of mass communication,'" but not other means of distribution, the Court observes. *Ante*, at 540. But our cases which have struck down laws that limit or burden the press due to their underinclusiveness have involved situations where a legislature has singled out one segment of the news media or press for adverse treatment, see, *e. g.*, *Daily Mail* (restricting newspapers and not radio or television), or singled out the press for adverse treatment when compared to other similarly situated enterprises, see, *e. g.*, *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 578 (1983). Here, the Florida law evenhandedly covers all "instrument[s] of mass communication" no matter their form, media, content, nature, or purpose. It excludes neighborhood gossips, cf. *ante*, at 540, because presumably the Florida Legislature has determined that neighborhood gossips do not pose the danger and intrusion to rape victims that "instrument[s] of mass communication" do. Simply put: Florida wanted to prevent the widespread distribution of rape victims' names, and therefore enacted a statute tailored almost as precisely as possible to achieving that end.

Moreover, the Court's "underinclusiveness" analysis itself is "underinclusive." After all, the lawsuit against the Star which is at issue here is not an action for violating the statute which the Court deems underinclusive, but is, more accurately, for the negligent publication of appellee's name. See App. to Juris. Statement A10. The scheme which the Court should review, then, is not only § 794.03 (which, as

noted above, merely provided the standard of care in this litigation), but rather, the whole of Florida privacy tort law. As to the latter, Florida does recognize a tort of publication of private facts.[3] Thus, it is quite possible that the neighborhood gossip whom the Court so fears being left scot free to spread news of a rape victim's identity would be subjected to the same (or similar) liability regime under which appellant was taxed. The Court's myopic focus on § 794.03 ignores the probability that Florida law is more comprehensive than the Court gives it credit for being.

Consequently, neither the State's "dissemination" of B. J. F.'s name, nor the standard of liability imposed here, nor the underinclusiveness of Florida tort law requires setting aside the verdict for B. J. F. And as noted above, such a result is not compelled by our cases. I turn, therefore, to the more general principles at issue here to see if they recommend the Court's result.

### III

At issue in this case is whether there is any information about people, which—though true—may not be published in the press. By holding that only "a state interest of the highest order" permits the State to penalize the publication of truthful information, and by holding that protecting a rape victim's right to privacy is not among those state interests of the highest order, the Court accepts appellant's invitation, see Tr. of Oral Arg. 10–11, to obliterate one of the most noteworthy legal inventions of the 20th century: the tort of the publication of private facts. W. Prosser, J. Wade, & V. Schwartz, Torts 951–952 (8th ed. 1988). Even if the Court's opinion does not say as much today, such obliteration will follow inevitably from the Court's conclusion here. If the First Amendment prohibits wholly private per-

---

[3] See, e. g., Cape Publications, Inc. v. Hitchner, 514 So. 2d 1136, 1137–1138 (Fla. App. 1987); Loft v. Fuller, 408 So. 2d 619, 622 (Fla. App. 1981).

sons (such as B. J. F.) from recovering for the publication of the fact that she was raped, I doubt that there remain any "private facts" which persons may assume will not be published in the newspapers or broadcast on television.[4]

Of course, the right to privacy is not absolute. Even the article widely relied upon in cases vindicating privacy rights, Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890), recognized that this right inevitably conflicts with the public's right to know about matters of general concern—and that sometimes, the latter must trump the former. *Id.*, at 214–215. Resolving this conflict is a difficult matter, and I fault the Court not for attempting to strike an appropriate balance between the two, but rather, fault it for according too little weight to B. J. F.'s side of equation, and too much on the other.

---

[4] The consequences of the Court's ruling—that a State cannot prevent the publication of private facts about its citizens which the State inadvertently discloses—is particularly troubling when one considers the extensive powers of the State to collect information. One recent example illustrates this point.

In *Boettger* v. *Loverro*, 521 Pa. 366, 555 A. 2d 1234 (1989), police officers had lawfully "tapped" the telephone of a man suspected of bookmaking. Under Pennsylvania law transcripts of the conversations intercepted this way may not be disclosed. 18 Pa. Cons. Stat. § 5703 (1988). Another statute imposes civil liability on any person who "discloses" the content of tapped conversations. § 5725. Nonetheless, in a preliminary court hearing, a prosecutor inadvertently attached a transcript of the phone conversations to a document filed with the court. A reporter obtained a copy of the transcript due to this error, and his paper published a version of the remarks disclosed by the telephone tap. On appeal, the Supreme Court of Pennsylvania upheld a civil liability award of $1,000 against the paper for its unlawful disclosure of the contents of the phone conversations, concluding that individuals' rights to privacy outweighed the interest in public disclosure of such private telephone communications. *Boettger, supra,* at 376–377, 555 A. 2d, at 1239–1240.

The Court's decision today suggests that this ruling by the Pennsylvania court was erroneous. In light of the substantial privacy interest in such communications, though, cf. *Katz* v. *United States*, 389 U. S. 347 (1967), I would strike the balance as the Pennsylvania Supreme Court did.

I would strike the balance rather differently. Writing for the Ninth Circuit, Judge Merrill put this view eloquently:

"Does the spirit of the Bill of Rights require that individuals be free to pry into the unnewsworthy private affairs of their fellowmen? In our view it does not. In our view, fairly defined areas of privacy must have the protection of law if the quality of life is to continue to be reasonably acceptable. The public's right to know is, then, subject to reasonable limitations so far as concerns the private facts of its individual members." *Virgil* v. *Time, Inc.*, 527 F. 2d 1122, 1128 (1975), cert. denied, 425 U. S. 998 (1976).

Ironically, this Court, too, had occasion to consider this same balance just a few weeks ago, in *United States Department of Justice* v. *Reporters Committee for Freedom of Press*, 489 U. S. 749 (1989). There, we were faced with a press request, under the Freedom of Information Act, for a "rap sheet" on a person accused of bribing a Congressman—presumably, a person whose privacy rights would be far less than B. J. F.'s. Yet this Court rejected the media's request for disclosure of the "rap sheet," saying:

"The privacy interest in maintaining the practical obscurity of rap-sheet information will always be high. When the subject of such a rap sheet is a private citizen and when the information is in the Government's control as a compilation, rather than as a record of 'what the government is up to,' the privacy interest . . . is . . . at its apex while the . . . public interest in disclosure is at its nadir." *Id.*, at 780.

The Court went on to conclude that disclosure of rap sheets "categorical[ly]" constitutes an "unwarranted" invasion of privacy. *Ibid.* The same surely must be true—indeed, much more so—for the disclosure of a rape victim's name.

I do not suggest that the Court's decision today is a radical departure from a previously charted course. The Court's

ruling has been foreshadowed. In *Time, Inc.* v. *Hill*, 385 U. S. 374, 383–384, n. 7 (1967), we observed that—after a brief period early in this century where Brandeis' view was ascendant—the trend in "modern" jurisprudence has been to eclipse an individual's right to maintain private any truthful information that the press wished to publish. More recently, in *Cox Broadcasting*, 420 U. S. at 491, we acknowledged the possibility that the First Amendment may prevent a State from ever subjecting the publication of truthful but private information to civil liability. Today, we hit the bottom of the slippery slope.

I would find a place to draw the line higher on the hillside: a spot high enough to protect B. J. F.'s desire for privacy and peace-of-mind in the wake of a horrible personal tragedy. There is no public interest in publishing the names, addresses, and phone numbers of persons who are the victims of crime—and no public interest in immunizing the press from liability in the rare cases where a State's efforts to protect a victim's privacy have failed. Consequently, I respectfully dissent.[5]

---

[5] The Court does not address the distinct constitutional questions raised by the award of punitive damages in this case. *Ante*, at 541, n. 9. Consequently, I do not do so either. That award is more troublesome than the compensatory award discussed above. Cf. Note, Punitive Damages and Libel Law, 98 Harv. L. Rev. 847 (1985).