SENTELLE, Circuit Judge,
dissenting.
In the first eight paragraphs of its opinion, the majority accurately lays out the somewhat extended history of this case. Two persons not parties to the case unlawfully intercepted communications of the appellee and gave a tape of the communications to the appellant in violation of 18 U.S.C. § 2511(l)(a) and (l)(c). Appellee brought the present action, which the district court dismissed, reasoning this application of the statute violated the First Amendment guarantee to the right of free speech.
*213 The defendant appealed. In a split decision, a panel of this court (identical to the present panel) reversed the dismissal, holding that the application of section 2511(l)(c) and a parallel Florida statute “are not unconstitutional as applied in this case.” Boehner v. McDermott, 191 F.3d 463, 478 (D.C.Cir.1999); see also id. at 480 (Ginsburg, J., concurring). I disagreed with the majority’s opinion then, as I do today. As I perceived the case then, and as I perceive it now, the issue is: “Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from á source who has obtained it unlawfully, may the government punish the ensuing publication of that information básed on the defect in a chain?” Id. at 484-85 (Sentelle, J., dissenting) (quoted in Bartnicki v. Vopper, 532 U.S. 514, 528, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001)). I would have answered that question in the negative. While I thought the appropriate test to be a strict scrutiny applicable to content-based limitation on the exercise of free speech, see id. at 481 (Sentelle, J., dissenting), a proposition ultimately rejected by the Supreme Court in Bartnicki, I nonetheless would reach the same conclusion today under tests applicable to “content-neutral law[s] of general applicability.” Bartnicki, 532 U.S. at 526, 121 S.Ct. 1753. Moreover, I would reach such a conclusion with confidence, based on the Supreme Court’s decision adjudicating the constitutionality of a similar application of this same statement in Bartnicki
At approximately the same time that our prior decision was making its way to the Supreme Court, the Supreme Court granted certiorari in Bartnicki v. Vopper, 200 F.3d 109 (3d Cir.1999), to answer precisely the issue before us in Boehner. See Bartnicki v. Vopper, 530 U.S. 1260, 120 S.Ct. 2716, 147 L.Ed.2d 981 (2000) (granting certiorari ). In Bartnicki, the Third Circuit had concluded that the application of 18 U.S.C. § 2511(l)(c) to prevent disclosure of information obtained by the disclosing person from a tape of unlawfully intercepted communications was constitutionally “invalid” because it “deterred significantly more speech than necessary to protect the privacy interests at stake.” 532 U.S. at 522, 121 S.Ct. 1753. The Supreme Court expressly granted certiorari “to resolve the conflict,” between Bartnicki and our decision in Boehner. Id. The Supreme Court affirmed the decision of the Third Circuit, id. at 535, 121 S.Ct. 1753, and thereby resolved the conflict in favor of the Third Circuit’s decision, not our decision in Boehner.
In Bartnicki, the chief negotiator for a Union Local, which was then engaged in negotiations on behalf of teachers with a local school board, used a cellular phone to call the president of the Union “and engage in a lengthy conversation about the status of the negotiations.” Id. at 518, 121 S.Ct. 1753. At one point in the conversation, referring to the school board’s “intransigence,” she said “ ‘we’re gonna have to go to their ... homes ... [t]o blow off their front porches Id. at 518-19, 121 S.Ct. 1753. A local radio commentator, respondent in the Supreme Court, broadcast a tape of the conversation on a radio show. All parties agreed that the tape, like the tape of Boehner’s conversation released by McDermott, was the result of an unlawful interception. The identity of the interceptor remained undisclosed throughout the litigation. The Union officers, like Boehner in the instant case, sued the publishers of the contents of the tape. In that case, the defendants included the broadcaster, the radio stations over which he made his broadcast, and the person who furnished the broadcaster with the tape, himself the head of a local citizens’ group who testified that he had obtained the tape when it was left anonymously in his mailbox. Like Boehner *214 in the case before us, plaintiffs relied on section 2511(l)(c) and a state statute of similar import. The district court granted summary judgment for the plaintiffs, rejecting the defendant’s First Amendment defense. As noted above, the Third Circuit, in a divided opinion, disagreed, reversed the trial court, and remanded with directions to the district court to grant the summary judgment motions of the defendants on the basis of the First Amendment defense. Bartnicki, 200 F.3d at 129.
On certiorari the Supreme Court, as had the Third Circuit, ruled that the statute was content neutral and subjected the statute to review under the “intermediate scrutiny” standard. 532 U.S. at 521, 526, 121 S.Ct. 1753. While that standard is less stringent than the one I would have erroneously applied to the case before us, the result was nonetheless the one that I contended should have prevailed in Boehner. That is, the Supreme Court ruled that the statute was unconstitutional as applied.
In addressing the issue, the Supreme Court adopted my formulation:
Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?
Id. at 528, 121 S.Ct. 1753 (quoting Boehner, 191 F.3d at 484-85) (Sentelle, J., dissenting). In analyzing the law on that subject, the Supreme Court first noted that “[a]s a general matter, ‘state action to punish the publication of truthful information seldom can satisfy constitutional standards.’ ” Id. at 527, 121 S.Ct. 1753 (quoting Smith v. Daily Mail Publ’g Co., 443 U.S. 97, 102, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979)). The Supreme Court then expressed its continuing belief “that the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.” Id. at 529, 121 S.Ct. 1753 (quoting Florida Star v. B.J.F., 491 U.S. 524, 532-33, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989)) (alteration in original). In applying that balance to the facts before it, the Court observed that the United States, appearing in the case to defend the constitutionality of the statute, had identified “two interests served by the statute.” Id. The first of those interests was the removal of “an incentive for parties to intercept private conversations,” and the second, to “minimiz[e] the harm to persons whose conversations have been illegally intercepted.” Id. While the Court was willing to “assume that those interests adequately justify the prohibition in § 2511(l)(d) against the interceptor’s own use of information ... acquired by violating § 2511(l)(a),” the Court explicitly stated that “it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends.” Id.
The Court easily dispensed with the first justification, opining that “[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.” Id. The Court concluded, however, that “it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.” Id. at 529-30, 121 S.Ct. 1753. It further noted that “there is no basis for assuming that imposing sanctions” on the communicating possessor of conversations illegally taped by another “will deter the unidentified scanner from continuing to engage in surreptitious interceptions.” Id. at 531, 121 S.Ct. *215 1758. Thus, the Court held that “the Government’s first suggested justification for applying § 2511(l)(e) to an otherwise innocent disclosure of public information is plainly insufficient.” Id. at 532, 121 S.Ct. 1753.
However, the Court found the government’s second justification, that is, the protection of privacy, “considerably stronger.” Id. It noted the importance of privacy of communication and the legitimacy of the argument that “fear of public disclosure of private conversations might well have a chilling effect on private speech.” Id. at 533, 121 S.Ct. 1753. Nonetheless, the Court was convinced that the enforcement of section 2511(l)(e) on the facts before it, “implieat[ed] the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern.” Id. at 533-34, 121 S.Ct. 1753. In concluding that this second interest did not have sufficient strength to warrant the limitation on publication of truthful information of public concern, the Court reiterated the classic principle that “ ‘[t]he right of privacy does not prohibit any publication of matter which is of public or general interest.’ ” Id. at 534, 121 S.Ct. 1753 (quoting Samuel D. Warren & Louis D. Brandéis, The Right to Privacy, 4 Harv. L. Rev. 193, 214 (1890)).
In the light of the Supreme Court’s resolution of the conflict between our Boehner decision and the Third Circuit’s decision in its Bartnicki opinion, there is no justification for us to hold otherwise on the facts before us. There is no distinction of legal let alone constitutional significance between our facts and those before the Court in Bartnicki As the majority admits, “[t]he Bartnicki Court held that under the First Amendment, § 2511(l)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it, 532 U.S. at 535, 121 S.Ct. 1753.” Maj. Op. at 1013. That said, the majority is unable to produce a distinction between this case and Bartnicki. Granted, the majority states:
The difference between this case and Bartnicki is plain to see. It is the difference between someone who discovers a bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.
Maj. Op. at 1017 (footnotes omitted). In fact, the difference is not plain at all. In Bartnicki the Supreme Court expressly stated:
The suit at hand involves the repeated intentional disclosure of an illegally intercepted cellular telephone conversation about a public issue. The persons who made the disclosures did not participate in the interception, but they did know — or at least had reason to know— that the interception was unlawful.
532 U.S. at 517-18, 121 S.Ct. 1753. The majority apparently would make the distinction between the two cases based on an analogy between a person who buys a diamond ring from a thief, and one who obtains a stolen diamond ring knowing it to be stolen or having at least good reason to know that it was stolen. I see no such distinction, let alone a plain one of constitutional significance. The Supreme Court underlined the lack of constitutional significance of the communicator’s knowledge that the interception had been unlawfully conducted. It stated that “[w]e accept petitioners’ submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents ‘had reason to know’ that it was unlawful.” Id. at 525, 121 S.Ct. 1753. The majority, apparently attempting to shore up its artificial distinction, states:
*216 As Chief Judge Ginsburg wrote in the original appeal: “One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not ‘lawfully obtained]’ that information in any meaningful sense.”
Maj. Op. at 1017 n.6 (quoting Boehner, 191 F.3d at 479 (Ginsburg, J., concurring)) (alteration in original).
The Supreme Court has directly dispelled that notion both in Bartnicki itself and previously. The Supreme Court in Bartnicki expressly stated, “[respondents’] access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else.” 532 U.S. at 525, 121 S.Ct. 1753. In support of this proposition the court cites and quotes Florida Star, which stated “[e]ven assuming the Constitution permitted a State to proscribe receipt of information, Florida has not taken this step.” 491 U.S. at 536, 109 S.Ct. 2603 (emphasis in original). Florida still has not taken that step, nor has Congress. Therefore, the otherwise-lawful receipt of unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully.
Even less convincing is the majority’s assertion that the Court mentioned the anonymity of the interceptor in Bartnicki several times and “distinguished this case on that ground.” Maj. Op. at 1014. The so-called distinguishing of the case occurred in a footnote stating as follows:
In the Boehner case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. In the opinion of the majority [of the D.C. Circuit], the defendant acted unlawfully in accepting the tape in order to provide it to the media.
532 U.S. at 522 n. 5, 121 S.Ct. 1753 (quoted at Maj. Op. at 1014) (internal citations omitted). Today’s majority hastens to say “[w]e do not want to read too much into the Court’s ‘but’ in the first sentence, yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative McDermott urges on us.” Maj. Op. at 1014. The referenced footnote occurs in the Court’s statement of the facts of the case and is never referenced in the legal analysis. Indeed, the footnote is subscribed to a textual sentence stating “[i]n so doing, [the Third Circuit dissenter] agreed with the majority opinion in a similar case decided by the Court of Appeals for the District of Columbia, Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999).” 532 U.S. at 522, 121 S.Ct. 1753. If the Supreme Court in fact thought that the “distinction” was of constitutional significance, one must wonder why it thought the different results in the two circuit cases constituted a disagreement. This wonderment must be greatly enhanced upon reading the next sentence, which reads “[w]e granted certiorari to resolve the conflict.” Id. The Supreme Court then goes on to resolve the conflict without making any further mention of any factual difference between the cases. To paraphrase the majority, one must wonder why the Court so easily dispensed with the distinction between one who knows who unlawfully intercepted a conversation and one who knows or has reason to know it was unlawfully intercepted. Indeed, the Supreme Court’s disposition of the case lays to rest any distinction even between the one who knows and the one who has reason to know. The Court reversed and remanded, directing entry of judgment for the defense on the constitutional theory. The record before the Court did not establish whether the defendants knew or only had reason to know of the unlawful obtaining of the conversations. If there were any *217 such distinction in the High Court’s view, the disposition would have been a vacatur and remand for the lower courts to establish upon which side of the “distinction” them case fell — that is, to determine whether the respondents knew or only had reason to know. As the Court made no such disposition, there is plainly no such distinction of constitutional magnitude.
The Supreme Court having decided the very issue of this case, that is, whether the United States (or Florida) can constitutionally bar the publication of information originally obtained by unlawful interception but otherwise lawfully received by the communicator, my opinion on whether that decision is correct or incorrect matters little. Nonetheless, I will venture to say that an opposite rule would be fraught ■with danger. Just as Representative McDermott knew that the information had been unlawfully intercepted, so did the newspapers to whom he passed the information. I see no distinction, nor has Representative Boehner suggested one, between the constitutionality of regulating communication of the contents of the tape by McDermott or by The Washington Post or The New York Times or any other media resource. For that matter, every reader of the information in the newspapers also learned that it had been obtained by unlawful intercept. Under the rule proposed by Representative Boehner, no one in the United States could communicate on this topic of public interest because of the defect in the chain of title. I do not believe the First Amendment permits this interdiction of public information either at the stage of the newspaper-reading public, of the newspaper-publishing communicators, or at the stage of Representative McDermott’s disclosure to the news media. Lest someone draw a distinction between the First Amendment rights of the press and the First Amendment speech rights of nonprofessional communicators, I would note that one of the communicators in Ba7tnicki was himself a news commentator, and the Supreme Court placed no reliance on that fact.
In sum, I respectfully dissent.