No. 92-152

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

---

JOHN A. LENCE and JOHN A. LENCE, P.C.
a Montana professional corporation,

Plaintiffs and Appellants,

-vs-

HAGADONE INVESTMENT CO., a Nevada
Corporation, d/b/a INTER LAKE
PUBLISHING CO., DANIEL BLACK,
JACQUELINE L. ADAMS, et al.,

Defendants and Respondents.

---

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Michael H. Keedy, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Alan J. Lerner, Attorney at Law, Kalispell, Montana
Larry M. Elison, Attorney at Law, Missoula, Montana
(argued)

For Respondents:

Gary R. Christiansen; Warden, Christiansen, Johnson
& Berg, Kalispell, Montana
Robert C. Bernius; Nixon, Hargrave, Devans & Doyle,
Washington, D.C. (argued)

FILED

MAY 27 1993

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted: December 10, 1992

Decided: May 27, 1993

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from summary judgment granted by the District Court of the Eleventh Judicial District, County of Flathead, the Honorable Michael H. Keedy presiding. Appellant John A. Lence (Lence) sued the respondents (collectively, Inter Lake) in June 1989 for damages arising from libel, false light invasion of privacy, intentional and negligent infliction of emotional distress, and negligence. Inter Lake answered Lence's complaint in July 1989, and in July 1990 filed a motion for summary judgment. In January 1992 the court issued a memorandum and order granting the motion, and Lence appealed. We affirm.

Lence's claims are based on three articles published in the Daily Inter Lake in November 1988 and April 1989, on two unrelated matters. Lence included all three articles in his complaint, and all three are considered here.

## The 1988 Article

On November 30, 1988, the Daily Inter Lake published an article, under the heading "Lawyer-client dispute probed," reporting that the Montana Supreme Court's Commission on Practice was looking into "allegations of fraud and professional misconduct on the part of Kalispell attorney John A. Lence." The article stated that local building contractor L. Craig Semenza (Semenza) had filed a complaint against Lence with the "high court," alleging fraud, professional misconduct, and failure to pay $67,511 for Semenza's work remodelling Lence's office.

2

The article also stated that Semenza had been charged in September 1988 with criminal mischief after someone flooded Lence's offices with a garden hose inserted through a hole drilled in the ceiling; that the county attorney was dropping this charge against Semenza because of insufficient evidence; that Lence had handled legal matters for Semenza's contracting business; and that Semenza had fired Lence and wanted to bring a theft charge against him because he had refused to give Semenza access to his corporate records.

Lence's attorney, Alan Lerner, wrote to the Daily Inter Lake demanding a retraction. Mr. Lerner's letter identified the portions of the article that Lence considered defamatory and included statements describing the "true facts." Inter Lake published these statements on December 11, 1988, under the heading "Attorney takes exception to DIL [Daily Inter Lake] story."

Lence objected particularly to the second paragraph of the article, which stated that Semenza had filed his complaint with "the high court." In reality, of course, Semenza had filed his complaint with the Commission on Practice (Commission). Under the Montana Supreme Court Rules for Lawyer Disciplinary Enforcement, only the Commission may file a formal complaint against a lawyer.

When the author of the 1988 article, respondent Jacqueline Adams (Adams), spoke with Semenza, the proceedings before the Commission were confidential, pursuant to Rule 13 of the Rules for Lawyer Disciplinary Enforcement, because no formal complaint had been filed. But because Semenza approached Adams with the

3

information and gave her a copy of this complaint, he, not she, violated the rule of confidentiality. The 1988 article was defamatory, Lence argues, because:

> The Daily Inter Lake's use of the words "high court" falsely informed all other attorneys reading the story that there was credible evidence to support the conclusion that [Lence] had committed fraud and was guilty of professional misconduct.

Lence complained that Adams had published the story without giving Lence an opportunity to comment and without investigating Semenza's allegations. Adams acknowledged these omissions in her deposition and stated:

> The story was based on the complaint filed with the Commission on Practice. And just as I would not contact people named in a civil suit about their part in it, I would not contact those named in a complaint to the Commission on Practice. It's not my job to determine who's calling who names and who's right.

Lence also objected to the article's failure to state that charges against Semenza, for flooding Lence's office, were to be dropped without prejudice. According to Lence, this omission implied that the county attorney had found no evidence against Semenza. In reality, he says, the county attorney "was not convinced of Semenza's innocence but needed time to obtain more evidence."

Adams admitted in her deposition that she knew before the article was published that charges against Semenza had been dropped without prejudice, and she agreed that the article would have been slightly less favorable to Semenza had she included and explained the phrase "without prejudice." She did not do that, she said, because "the deadline was at hand" when she learned of the

4

dismissal, and because she expected to write another story later, "when the actual matter came into court."

On April 3, 1989 the Commission notified Semenza, with a copy to Lence, that it had reviewed his complaint against Lence and found no ethical violation or breach of the Rules of Professional Conduct.

The 1989 Articles

On April 4, 1989 Inter Lake published a short article about a Kalispell Board of Appeals hearing on a building permit for "the Main Street offices of attorney John Lence." The article stated that the city judge had issued a summons to Lence, "who is charged with violating city codes by constructing openings in walls where they were prohibited." Lence had installed windows in the north side of the building, which was on the property line, after city officials had informed him that placing windows on the property line would violate the Uniform Building Code.

On April 9, 1989, the newspaper reported that Lence had pleaded innocent to the misdemeanor charge of violating the city building code and that the Kalispell Board of Appeals had approved a no-construction easement from the adjoining property owner, which satisfied the building code's open space requirement for buildings with windows.

At Lence's request, the newspaper printed an item in its "Corrections" column on April 20, 1989, stating that "GKL," a Montana corporation, not Lence, had been charged with a building code violation and explaining that Lence was the president of GKL

and his wife, Gwendolyn K. Lence, was the secretary.

Lence argues that the "sting" of these stories was "not that a violation had been alleged, but rather that [Lence], an attorney, had personally violated the law," and that Inter Lake should have known that the court files on the building code violation showed that GKL, not Lence, was the defendant.

In his deposition, however, Lence stated that GKL Corporation was merely a holding company created for the purpose of holding title to the building and that his wife was the sole stockholder. Lence appeared before the city judge on behalf of the corporation, and in their correspondence on this matter, both Lence and the city officials referred to the building as Lence's building.

The following issues are presented for review.

1. Whether, in light of Article II, section 7 of the Montana Constitution, the District Court erred in granting summary judgment.

2. Whether the First Amendment protects newspaper articles about a preliminary investigation of alleged attorney misconduct and an alleged violation of a city building code.

3. Whether the articles are privileged, under § 27-1-804(4), MCA, as fair and true reports, without malice, of official proceedings.

4. Whether the District Court erred in dismissing Lence's claim for false light invasion of privacy.

5. Whether Lence's emotional distress claim duplicates his defamation claim.

6

6.    Whether Lence's negligence claim is barred as a restatement of the fault element of his defamation claim.

I

Did the District Court err in granting summary judgment?

Lence contends that in granting summary judgment the District Court erred by deciding genuine issues of material fact; by failing to view the evidence in a light most favorable to the opposing party; and by failing to consider Article II, section 7 of the Montana Constitution, which provides, in part, that:

> In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

Lence's "genuine issues of material fact" are discussed below in the context of the remaining issues. The procedural issue--jury determination of law and facts in a libel case--was disposed of by this Court in Griffin v. Opinion Publishing Co. (1943), 114 Mont. 502, 138 P.2d 580, which held that it is for the court and not the jury to pass on motions for nonsuit, directed verdict, new trial, and so on, and in Williams v. Pasma (1982), 202 Mont. 66, 72, 656 P.2d 212, 215, which cited Griffin to support the proposition that "there is no absolute prohibition against granting summary judgment in libel cases." In libel cases as in other civil cases, summary judgment is appropriate when there are no material issues of fact and the evidence supports the judgment as a matter of law. Kurth v. Great Falls Tribune Co. (1991), 246 Mont. 407, 804 P.2d 393; Rule 56(c), M.R.Civ.P.

As we decide here that there are no material issues of fact

7

and that Inter Lake is entitled to judgment as a matter of law, we conclude that the District Court did not err in granting summary judgment.

II

Does the First Amendment protect the Daily Inter Lake articles?

In holding that Inter Lake's report of Semenza's complaint to the Commission is protected by a qualified constitutional privilege, the District Court relied on Landmark Communications, Inc. v. Virginia (1978), 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1.

In Landmark, the defendant newspaper published an article identifying a judge who was under investigation by the Virginia Judicial Inquiry and Review Commission. Like Montana's Rules for Lawyer Disciplinary Enforcement (Rules), the Virginia statute requires confidentiality of the investigation until a formal complaint is filed with the Virginia Supreme Court. Unlike Montana's Rules, the Virginia statute makes violation of the confidentiality rule a misdemeanor. The Virginia Supreme Court found the newspaper criminally liable, but the United States Supreme Court reversed, holding that the First Amendment does not permit criminal punishment of third parties, including the news media, for publishing truthful information about confidential proceedings of the Judicial Inquiry and Review Commission.

Lence contends that the District Court's reliance on Landmark is misplaced because the Virginia statute imposed criminal penalties; the case involved a public official and a matter of "the

8

most urgent governmental importance;" and the holding was expressly limited to the publication of truthful information. In contrast, Lence argues, the present case is a civil action brought by a private citizen and is, in Lence's view, "a private dispute without social or political significance."

By the time Landmark was decided, however, the Supreme Court had extended First Amendment protection to publications about private citizens. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. Both Gertz and Landmark are descendants of the seminal First Amendment case, New York Times v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, but Sullivan, like Landmark, involved alleged defamation of a public official. In Gertz, the plaintiff was an attorney described in a magazine published by the defendant as, among other things, a "Leninist" and "Communist-fronter." No evidence supported these allegations. The Supreme Court held that states have a legitimate interest in compensating private individuals for the harm inflicted on them by defamatory falsehood; therefore, states may define an "appropriate standard of liability for a publisher of defamatory falsehoods," so long as they do not impose liability without fault. Gertz, 418 U.S. at 347. See Madison v. Yunker (1978), 180 Mont. 54, 589 P.2d 126 (following Gertz in establishing the standard of liability for defamation of a private person).

In Landmark, the Supreme Court held unequivocally that the newspaper's publication of accurate factual information about an inquiry pending before the Judicial Inquiry and Review Commission

9

"served those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect." Landmark, 435 U.S. at 434. In Landmark and again in two cases involving private plaintiffs, the Court balanced these First Amendment interests against the interests served by preserving confidentiality and found that the latter were not sufficient to justify the subsequent punishment of speech.

Smith v. Daily Mail Publishing Co. (1979), 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399, ruled unconstitutional a West Virginia statute making it a crime for a newspaper to publish truthful information concerning the identity of juvenile offenders. The Florida Star v. B.J.F. (1989), 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443, held that where a newspaper had obtained a rape victim's name from a police report distributed to the press, a Florida statute making publication of the victim's name unlawful was unconstitutional. "[W]here a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." The Florida Star, 491 U.S. at 541.

If the public's interest in the dissemination of truth outweighs the state's interest in protecting the privacy of rape victims or juvenile offenders, then surely the public's interest in accurate information about attorney discipline outweighs the state's interest in preserving the confidentiality of Commission on Practice investigations, where, as here, the press obtained the information lawfully. Thus, Lence cannot recover unless he can

10

establish that the published information was false. "A private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." Philadelphia Newspapers, Inc. v. Hepps (1985), 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783, 793.

Lence contends that the published information in this case was neither truthful nor accurate and that the "irresponsible publication of false information is not privileged communication protected by the First Amendment." By "false information," he means the 1988 article's reference to the "high court" instead of the Commission on Practice; its failure to state that charges against Semenza had been dropped without prejudice; the implication that Lence had been charged with theft; and in the 1989 articles, the attribution of the building code violation to Lence instead of the GKL corporation. The evidence is sufficient, Lence argues, for a jury to conclude that these errors were not inconsequential or insignificant but instead were "gross distortions of the truth."

The District Court concluded, however, that the cited errors were inconsequential and that the articles were substantially true. The 1988 article did not allege that Lence had actually committed acts of fraud, professional misconduct and theft, but merely reported accurately that Semenza had filed a complaint alleging such acts, and that police records indicated that Semenza had told the police he wanted to bring a theft charge against Lence. Similarly, the 1989 articles were substantially true because the acts on which the misdemeanor building code violations were based

11

were the personal acts of Lence, not his corporation, and because Lence himself consistently treated his personal interests as identical to those of the GKL corporation.

We conclude that Lence failed to meet his threshold burden of establishing the falsity of the Daily Inter Lake articles.  The articles, therefore, are protected by the First Amendment as truthful information about a matter of public significance.

III

Does the fair and true report privilege protect the Daily Inter Lake articles?

Libel is a false and unprivileged publication.  Section 27-1-802, MCA (emphasis added).  If the publication appears to be privileged, the plaintiff must show that it is false.  Cooper v. Romney (1914), 49 Mont. 119, 128, 141 P. 289, 292.  Section 27-1-804, MCA, provides that for purposes of a defamation action, a "privileged publication" is one made in the proper discharge of an official duty, in any legislative or judicial proceeding, or:

> (4)   by a fair and true report without malice of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

The District Court concluded that under this statute, the Daily Inter Lake articles were privileged and therefore not defamatory.

Whether a publication is privileged is a question of law for the court, where there is no dispute about the content of the proceedings on which the publication is based.  Rasmussen v. Bennett (1987), 228 Mont. 106, 110, 741 P.2d 755, 758; Crane v. Arizona Republic (C.D. Cal. 1989), 729 F.Supp. 698, 702.  Our

12

review of this issue is confined to determining whether the District Court's interpretation of the law is correct. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 803 P.2d 601.

We hold that the District Court concluded correctly that a preliminary Commission on Practice investigation is part of a judicial proceeding, and that the 1988 Daily Inter Lake article therefore was privileged. See Cox v. Lee Enterprises, Inc. (1986), 222 Mont. 527, 529, 723 P.2d 238, 240 ("judicial proceeding" defined to include, for example, "any proceeding to obtain such remedy as the law allows"). The 1989 articles, which described Lence's alleged violations of the Kalispell building code, clearly were privileged under § 27-1-804(4), MCA.

As Lence presented no evidence showing that the articles were false, and all three were privileged as a matter of law, Inter Lake was entitled to summary judgment.

IV

Did the District Court err in declining to recognize Lence's claim of false light invasion of privacy?

False light invasion of privacy is (1) the publicizing of a matter concerning another that (2) places the other before the public in a false light, when (3) the false light in which the other is placed would be highly offensive to a reasonable person, and (4) the actor knew of or acted in reckless disregard as to the falsity of the publicized matter. Restatement (Second) of Torts § 652E (1977).

Here, Lence has no legitimate claim for false light invasion

13

of privacy because he failed to establish the falsity of the Daily Inter Lake articles. See Restatement (Second) of Torts § 652E, comment a ("it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true").

V

Did the District Court err in holding that Lence's emotional distress claims fail?

The District Court held that Lence could not recover for emotional distress because the Daily Inter Lake statements were substantially true and without malice. Citing Hustler Magazine v. Falwell (1988), 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41, the court concluded that emotional distress claims are subject to the same First Amendment defenses as the libel suit. Because the plaintiff in Falwell was a public figure, subject to an "actual malice" standard, while Lence is a private person, we affirm on this issue for different reasons.

This Court has adopted the requirements for recovering damages for infliction of emotional distress that are set out in Restatement (Second) of Torts § 46 Comment j (1965). First Bank v. Clark (1989), 236 Mont. 195, 771 P.2d 84. The victim must show that the defendant's tortious conduct resulted either in physical or mental injury or in "a substantial invasion of a legally protected interest," and that it "caused a significant impact," including emotional distress "so severe that no reasonable person could be expected to endure it." Clark, 771 P.2d at 91.

Lence argues that "untrue charges of fraud, professional

14

misconduct, theft and crime" are "sufficiently outrageous" to sustain a cause of action for severe emotional distress, but he offers no evidence of severe emotional distress. In his deposition he described a visit to a hospital emergency room approximately two weeks after the 1988 article was published, for "stress and heart-related problems and circulatory problems" that he had not had previously. The only other evidence of distress or "significant impact" is Lence's statement that he missed a meeting of a client's board of directors on the day after the 1988 article appeared.

Even if Lence could legitimately plead emotional distress, the Daily Inter Lake articles would have had to be more than merely hurtful or offensive; they would have had to be "so outrageous . . . as to go beyond all possible bounds of decency." Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 123, 760 P.2d 57, 64. The newspaper's truthful publication that Semenza had lodged a complaint with the Commission, and its report of the building code dispute, hardly constitute outrageous conduct that goes beyond all possible bounds of decency.

In the past we have characterized emotional distress as an element of damages rather than a distinct cause of action; see Frigon, 760 P.2d at 63; Shiplet v. First Security Bank (1988), 234 Mont. 166, 174, 762 P.2d 242, 247. Even if considered only for the purpose of establishing damages, however, Lence's deposition testimony demonstrates the absence of any genuine issue of material fact concerning the severity of his alleged emotional distress.

15

Was Lence's negligence claim barred as a restatement of the fault element of his defamation claim?

Lence argues that the District Court erred in dismissing his negligence claim because "the facts of this case present a separate and distinct cause of action for negligence." He claims that Inter Lake was under a duty to investigate Semenza's allegations before repeating them to the public, that Inter Lake owed Lence a duty of care in their choice of words describing the status of Semenza's complaint, and that Inter Lake owed Lence a duty of confidentiality under Rule 13C, Montana Supreme Court Rules for Lawyer Disciplinary Enforcement. By disseminating Semenza's allegations without investigation, Lence argues, Inter Lake breached not only its duties to Lence but also its direct duty to keep information about a Commission investigation confidential.

As a result of Inter Lake's breach of duty, Lence claims, he has suffered damage to his reputation and business and "extreme emotional harm, humiliation, and physical stress which led to a doctor's visit." The First Amendment does not protect a media defendant from suits that can be brought generally under common law theories of liability, Lence argues, citing Cohen v. Cowles Co. (1991), ___ U.S. ___, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586, 597 (a newspaper publisher "has no special privilege to invade the rights and liberties of others"). Thus, Lence contends, he has a right to present his negligence theory of liability to a jury.

The District Court dismissed Lence's negligence claim on the

16

grounds that it "merely reiterates the fault element of the libel claim." We hold that Lence's negligence claim fails even if it is considered independently of his libel claim.

To prevail in a negligence action, a plaintiff must prove the following elements: a duty owing from the defendant to himself; a breach of that duty; proximate causation; and damages. Scott v. Robson (1979), 182 Mont. 528, 535-536, 597 P.2d 1150, 1154. Here, Inter Lake owed no duty to Lence to investigate or to keep the Commission investigation confidential. Semenza's allegations, after all, had been made to a body authorized to investigate them. Adams' role was merely to let the public know that an investigation had been initiated, not to undertake an investigation herself.

It is clear that Rule 13D, Montana Supreme Court Rules for Lawyer Disciplinary Enforcement, imposed a duty on Semenza, because it unequivocally requires "participants" in a disciplinary proceeding to "conduct themselves so as to maintain the confidentiality mandated by this rule." Semenza violated this rule when he approached Adams with the information and gave her a copy of his complaint, but Adams committed no wrong in receiving the information. Further, the rule does not apply to an accurate republication of Semenza's allegations. First, as we have seen, the 1988 Daily Inter Lake article is privileged under § 27-1-804(4), MCA. See also Dameron v. Washington Magazine, Inc. (D.C. Cir. 1985), 779 F.2d 736 (in a libel action brought by an air traffic controller against The Washingtonian, the court held that republication of a defamation uttered by another is immune when it

17

is a fair and accurate report of official proceedings); Law Firm of Daniel P. Foster v. Turner Broadcasting System, Inc. (2nd Cir. 1988), 844 F.2d 955 (dismissing a libel action on the grounds that CNN's broadcast of statements made by FBI officials was substantially accurate and therefore privileged under the state's fair and true report statute).

Second, our constitution gives a high priority to the public's right to know. It can be abridged only when "the demand of individual privacy clearly exceeds the merits of public disclosure." Art. 2, § 9, Mont. Const. See Great Falls Tribune Co., Inc. v. Cascade County Sheriff (1989), 238 Mont. 103, 775 P.2d 1267 (when law enforcement officers have engaged in conduct that subjects them to disciplinary action, the public's right to know outweighs law enforcement officers' privacy interests). Here, the merits of disclosing that an attorney has been accused of misconduct clearly outweigh the demand of individual privacy, when the misconduct is presented as a mere allegation by a person whose motivation and probable unreliability are adequately conveyed in the publication.

As Inter Lake owed no duty to Lence, it is entitled to judgment on Lence's negligence claim as a matter of law.

Affirmed on all issues.

John Conway Harrison
Justice

18

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice Terry N. Trieweiler dissenting in part and concurring in part.

I dissent from that part of the majority opinion which concludes that defendants' publication of the November 30, 1988, article was privileged as a matter of law. I conclude that there was no constitutional privilege which applied to this case and that whether there was a statutory privilege was an issue of fact which could not be resolved by summary judgment.

The United States Supreme Court's decision in *Landmark Communications, Inc. v. Virginia* (1978), 435 U.S. 829, 98 S. Ct. 1535, 56 L. Ed. 2d 1, which is relied upon by the majority was a narrow decision limited to the facts before the Court in that case. Those facts bear no similarity to the facts alleged in this case.

In *Landmark*, 435 U.S. at 837, the issue before the Supreme Court was stated as follows:

> The narrow and limited question presented, then, is whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.

The differences in *Landmark* are readily apparent. First, and most importantly, that decision involved a judicial officer. This case involves a private citizen. Second, that case involved admittedly truthful information, while the plaintiff in this case alleged that the material published by defendants was untruthful. Finally, the issue in *Landmark* was whether the publisher of truthful

20

information can be punished, while the issue in this case is whether the victim of untruthful information can be compensated.

In arriving at its conclusion that a constitutional privilege protected the defendant, the Supreme Court relied heavily on its rationale that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark*, 435 U.S. at 839.

There is no similar public concern in this case.

Neither did *Smith v. Daily Mail Publishing Company* (1979), 443 U.S. 97, 99 S. Ct. 2667, 61 L. Ed. 2d 399, nor *Florida Star v. B.J.F.* (1989), 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (cases also relied upon by the majority), involve facts or issues similar to those in this case. Both cases again involved the limited issue of whether a state could criminally punish the publication of truthful information. In fact, in *Smith*, 443 U.S. at 105-06, the Court held that:

> Our holding in this case is narrow . . . there is no issue here of privacy . . . . At issue is simply the power of a state to punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper. The asserted state interest cannot justify the statute's imposition of criminal sanctions on this type of publication.

In *Philadelphia Newspapers, Inc. v. Hepps* (1986), 475 U.S. 767, 777, 106 S. Ct. 1558, 1564, 89 L. Ed. 2d 783, 793, the Supreme Court simply held that when the subject of a newspaper article involved matters of government it was of sufficient public interest that the

21

plaintiff would be required to prove the falsity of the publication before he could recover damages for defamation.

However, in this case, the plaintiff was neither a public official nor a public figure and the accusations made against him involved a simple dispute between an attorney and his client. There was no significant public interest in the subject of defendants' newspaper article. According to the U.S. Supreme Court's decisions, this type of communication possesses no significant constitutional privilege. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985), 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593. In *Hepps*, the Supreme Court summarized First Amendment protection for newspapers in the following fashion:

> One can discern in these decisions two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in *Gertz*, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet*, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape. [Emphasis added.]

*Hepps*, 475 U.S. at 775.

22

The majority concludes under Issue II that pursuant to the *Hepps* decision, Lence must prove that the Daily Inter Lake article was untrue; and that since the inaccuracies in the article were inconsequential, he has not met that burden. It is true that he must prove the article's falsity. However, that is not because of *Hepps*. It is because, by statute, falsity is a required element of a libel action in Montana. Section 27-1-802, MCA.

When the majority concludes that the article is substantially true, it misconstrues the nature of Lence's complaint. His complaint is that the November 30, 1988, article in the Daily Inter Lake repeated Semenza's defamatory allegations that Lence committed fraud and professional misconduct, refused to pay Semenza for work that had been done, and unlawfully retained Semenza's files. Lence contends that these allegations were untrue, and in support of that contention, he offers the fact that the complaint against him before the Commission on Practice was subsequently dismissed.

A newspaper cannot avoid liability by honestly pointing out that it is simply repeating statements made by others. "[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Restatement (Second) of Torts, § 578 (1977).

Therefore, while I concur with the majority that the 1989 articles regarding building code violations were substantially true, I disagree that the accusations contained in the 1988 article were substantially true, and I disagree that the authorities relied

23

upon by the majority under Issue II of that opinion grant any privilege to the Daily Inter Lake for the November 30, 1988, article that it published.

If there is any privilege for the November 30, 1988, article, it is based upon § 27-1-804(4), MCA. That section provides that:

A privileged publication is one made:

. . . .

(4) by a fair and true report <u>without malice</u> of a judicial, legislative, or other public official proceeding or of anything said in the course thereof. [Emphasis added.]

I agree that the Daily Inter Lake's reference to the Supreme Court had no significance to anyone other than attorneys, and that attorneys who read the entire article would not be mislead by that reference. Therefore, the November 30, 1988, article was "a fair and true report of a judicial proceeding." However, § 27-1-804(4), MCA, also requires that the publication be without malice. Since the privilege is statutorily created, we must look to the statutory definition of malice in Montana's Code. The only one I am aware of is the one found at § 27-1-221, MCA, which defines malice as follows:

(2) A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:

(a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or

(b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

24

Whenever the meaning of a word or phrase is defined in any part of the Montana Code Annotated, that definition is applicable to the same word or phrase when it appears elsewhere. Section 1-2-107, MCA.

I conclude, based upon the testimony of Jacqueline Adams, the author of the article about which Lence complains, that there was a factual issue regarding whether Adams was aware of facts which suggested a high probability of damage to Lence, and then acted with indifference to that high probability.

Adams testified that she first met Semenza during the month in which the article was published. She knew that he had been previously accused of flooding Lence's office and causing substantial damage. She knew, based upon that accusation and her interview with Semenza, that he had a high degree of animosity toward Lence. She had no prior experience with Semenza which would indicate that he was a reliable source of information. She was obviously aware of the fact that the allegations contained in the article would be very damaging to Lence's professional reputation. However, she testified that she did not give any great thought to that potential damage before publishing the article.

Instead of attempting to verify the allegations made by Semenza, she published them without any further investigation. Even though she was aware that Semenza had made his complaint about the theft of his files to the Kalispell Police Department, and even though she was aware of the officer to whom the complaint was made, she made no effort to confirm the truthfulness of that accusation.

25

She made no effort to contact Lence regarding Semenza's accusations; and made no other effort to independently verify anything she had been told by Semenza. She stated that it was not her job to determine who was calling who names and who was right.

Even after Semenza's complaint to the Commission on Practice was dismissed, there was no follow-up publication in the Daily Inter Lake which pointed that out.

There is a school of constitutional thought to which the majority apparently subscribes which holds that there is some public benefit from encouraging this kind of reckless disregard for the professional and personal reputation of others. However, I disagree. We are not, in this case, talking about prior restraint of speech or press. We are considering the similarly important rights of people who are damaged by the irresponsible exercise of First Amendment rights.

So long as reporters are given the broad immunity provided for in the majority opinion, they, like Adams, will continue to have no reason for caring about the truthfulness of the harmful allegations that they report. While this free-wheeling approach may serve the interest of free exchange of information, it certainly ignores an equally compelling interest that all private individuals have in preserving their reputation. As pointed out in *Gertz*, 418 U.S. at 341:

> The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for,

26

as MR. JUSTICE STEWART has reminded us, the individual's right to the protection of his own good name

> "reflects no more than our basic concept of the essential dignity and worth of every human being--a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (concurring opinion.)

I concur with the majority's disposition of Issues IV, V, and VI, but do not agree with all the reasons given for the majority's disposition of those claims. I would affirm the District Court's dismissal of those claims because they are, in substance, simply reallegations of plaintiff's claim for defamation. The elements necessary for each of those claims are essentially the same as the elements necessary to prove the plaintiff's defamation claim. Furthermore, I conclude that the facts alleged by the plaintiff do not satisfy the quantum or quality of proof necessary to establish a claim for intentional infliction of emotional distress and are not the type of facts for which we have previously recognized a claim for negligent infliction of emotional distress.

I also concur with the majority's disposition of Lence's claim for defamation based on the 1989 articles in the Daily Inter Lake. I would, however, reverse the District Court's judgment which dismissed Lence's claim based upon the November 30, 1988, article and remand that claim to the District Court for trial of the factual issue raised and discussed above. If, after consideration

27

of the facts presented, a jury determined that Adams' article was not published with malice as defined in our statutes, then I would conclude it was privileged. On the other hand, if a jury found that her conduct was malicious, I would conclude that Lence's claim for defamation is actionable.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent and concurrence.

_____
Justice

28

May 27, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Alan J. Lerner
Law Offices of Alan J. Lerner
P.O. Box 1158
Kalispell, MT    59903-1158

Larry M. Elison
Attorney at Law
1101 West Greenough Dr., # C-2
Missoula, MT    59802

Gary R. Christiansen
Warden, Christiansen, Johnson & Berg
P.O. Box 3038
Kalispell, MT    59903-3038

Robert C. Bernius
Nixon, Hargrave, Devans & Doyle
Ste. 800, One Thomas Circle
Washington, D.C.    20005


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy