**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2026

_____

Jay R. Coplin,                          *
                                        *
            Appellant,                  *
                                        *
      v.                                *
                                        *
Fairfield Public Access                 *
Television Committee; Robert            *
Glocke, Chairman, FPATV                 *
Committee; Allen Glonek, FPATV          *
Committee member; Susan Kessel,         *
FPATV Committee member; Paul            *   Appeal from the United States
Stokstad,FPATV Committee member;*       District Court for the
Robert Gates, FPATV Committee           *   Southern District of Iowa.
member; Lewis Wilson, II, FPATV         *
Station Manager; City of                *
Fairfield, Iowa; Robert                 *
Rasmussen, as Mayor; Ed Malloy,         *
member of City Council; Jay             *
Silverman, member of City               *
Council; Philip Young, member           *
of City Council; Joe Frakes,            *
member of City Council; Richard         *
Schneider, member of City               *
Council; Jeff Harris, member of         *
City Council; Mary Louise               *
Sutherlin, member of City               *
Council,                                *
                                        *
            Appellees.                  *

_____

Submitted: December 9, 1996

Filed: April 30, 1997

_____

Before McMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

Randy Coplin brought this action under 42 U.S.C. § 1983 (1994) against the Fairfield Public Access Television Committee (FPATV Committee) and members of the Fairfield, Iowa City Council (Council) for alleged violations of Coplin's rights under the First Amendment and the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521-559 (1994 & Supp. I 1995). Coplin seeks injunctive relief, declaratory relief, monetary damages, and attorney's fees. The district court bifurcated the proceedings; the issues on which Coplin sought injunctive and declaratory relief were to be presented in a bench trial while the monetary damages and attorney's fees claims were to be heard, if necessary, in a jury trial. Upon cross-motions for summary judgment in the bench trial, the district court[1] granted summary judgment to the FPATV Committee and the Council, dismissing Coplin's claims for injunctive and declaratory relief. The district court also held that 47 U.S.C. § 555a(a) (1994) precludes Coplin from recovering monetary damages and attorney's fees. We affirm in part, reverse in part, and remand.

**I.**

The FPATV Committee is a regulatory and advisory board created by the Council. The primary responsibility of the FPATV Committee is to supervise, manage, and control the activities of the Fairfield Public Access Television channel (FPATV). To fulfill its responsibility, the FPATV Committee promulgated the "Fairfield Public Access TV Rules, Regulations and Guidelines" (FPATV Rules).

---

[1]Following the bifurcation of the proceedings, the parties agreed, pursuant to 28 U.S.C. § 636(c) (1994), to have the case tried by a United States Magistrate Judge.

Under FPATV Rule I(A), "[t]he Fairfield Public Access TV (FPATV) facilities and cablecasting on Fairfield's Public Access TV channel are available to any resident of the City of Fairfield and its surrounding cable broadcast areas." FPATV Rule I(A), <u>reprinted in</u> J.A. at 340.

In May 1993, Coplin began producing and hosting a regularly scheduled talk show entitled <u>Fairfield Speaks</u> that he cablecast over FPATV. The show featured interviews with community leaders in government, business, and education as well as coverage of community events and movie reviews. Coplin opened each show by displaying and reading a disclaimer, required by FPATV rules, that informed the public that FPATV was not responsible for the content of Coplin's program.

In 1994, a local newspaper columnist, Marni Mellen, wrote an editorial critical of Coplin. In response, Coplin cablecast a segment on his September 26, 1994 show satirizing Mellen's views. During the segment, a woman allegedly pulled up her blouse and exposed her brassiere to the television camera. In October 1994, the Council and the FPATV Committee passed a resolution declaring the brassiere incident objectionable, and Coplin received a formal "Objectionable Content Warning" shortly thereafter. The letter warned Coplin that "if similar incidents occur in your future productions[,] you may [be] subject to sanctions by the FPATV Committee. These sanctions may include disallowing your use of FPATV." Letter from Lewis Wilson II, Manager of FPATV (Oct. 9, 1994) at 1, <u>reprinted in</u> J.A. at 157.

Before the warning was thirty days old, Coplin included, on his October 23, 1994 show, a one hour-long, live call-in segment in which he invited members of his viewing audience to respond by telephone to the University of Chicago's "Sex in America" survey,

the results of which had recently been published by Time magazine. See Philip Elmer-Dewitt, Now for the Truth about Americans and Sex, Time, Oct. 17, 1994, at 62, reprinted in J.A. at 192. The segment was co-hosted by Patti Schneider, a woman who also produced her own show on FPATV. During the segment, Coplin was dressed in a Halloween costume, including a mask and a wig.

Before any viewers called in, Coplin displayed and read a sign warning that "Fairfield is participating in a sex survey, please be discreet and candid in your responses." Fairfield Speaks Tr. (Oct. 24, 1995) at 2, reprinted in J.A. at 160. Coplin then turned to the Time article. Reading a question from the article, Coplin asked viewers if they had "'the nagging suspicion that in bedrooms across the country, on kitchen tables, in limos and other venues too scintillating to mention, other folks are having more sex, livelier sex and better sex.'" Id. (quoting Elmer-Dewitt, Now for the Truth about Americans and Sex, at 62, reprinted in J.A. at 192). He then started taking callers on the air. The calls were cablecast live with no delay.

One caller, named Lyle, who claimed to live in a trailer park, responded to the question by reporting that "I have that suspicion that other people are having more sex, because my neighbor, I look at their window and I see them going at it all the time." Id. at 5, reprinted in J.A. at 163. With prompting from Coplin, Lyle then revealed the exact address of his neighbor's residence (Trailer Park Residence). Id. at 6, reprinted in J.A. at 164. It was later learned that this residence actually does exist. During this exchange, Lyle spoke in an accent that he claimed was Irish, yet he also claimed that he was from Italy. See id. at 7-8, reprinted in J.A. at 165-66.

The next caller objected to the content of the segment, arguing that "this is certainly not in very good taste." Id. at 11, reprinted in J.A. at 169. Coplin and his co-host then engaged the caller in a discussion about the types of programming that he would prefer. After the call was completed, Coplin and his co-host questioned whether the complaining caller might be "someone on the board." Id. at 12, reprinted in J.A. at 170. Although never revealed on the air, it was later learned that the caller was in fact the husband of an FPATV Committee board member.

The following caller identified himself only as "Backyard." Backyard conjectured that the complaining caller did not like the segment "cause he don't get no sex." Id. He further suggested that the complaining caller was "probably doing the five knuckle shuffle on the old fist pump right now, anyway." Id.

Several callers later, a man identifying himself as "Gordo" bragged: "I get as much sex as I need." Id. at 25, reprinted in J.A. at 183. He claimed to live on the Harrison part of Second Street in Fairfield. Gordo opined that "[i]f you live there, you'll get more sex than you'll ever need." Id. When asked if the sex on Second Street was "premarital sex, marital sex or extramarital sex," Gordo responded: "Every kind you can think of." Id. at 26, reprinted in J.A. at 184. He then proceeded to identify a particular house on Second Street (Second Street Residence) by giving its address. It was later learned that this residence exists and was occupied at the time. Gordo reported that "[t]here's this green truck that comes there and stays . . . until four in the morning." Id. Gordo also reported that the truck comes "[a]round lunch time" to which Coplin responded: "Well, kind of a nooner, huh?" Id.

The final caller claimed that he lived in the same neighborhood as Lyle, the earlier caller allegedly from Italy who spoke in an Irish brogue. With Coplin's encouragement, the final caller confirmed that the occupants of the Trailer Park Residence "go at it all night and day." Id. at 28, reprinted in J.A. at 186. The final caller, like Lyle, gave the address of the residence.

On October 27, 1994, the FPATV Committee convened one of its regularly scheduled meetings and voted to ban Coplin from producing his show, appearing on any other FPATV show, and using FPATV facilities. Coplin was informed of this decision in a letter dated October 31, 1994. In the letter, the FPATV Committee also explained that they were taking disciplinary action because of the content of Coplin's programs. See Letter from Lewis Wilson II, Manager of FPATV (Oct. 31, 1994) at 1, reprinted in J.A. at 201 (barring Coplin from FPATV for "the illegal acts of: 1. Invasion of personal privacy. 2. Having content which is, libelous, slanderous, or defamatory either to individuals, families, or organizations"). On November 3, 1994, Coplin received a letter from Fairfield City Attorney, John Morrissey, clarifying the October 31 letter. Morrissey explained that the October 31 letter was only a preliminary determination and that Coplin had a right to a hearing before the FPATV Committee under Article V(C)(1) of the FPATV Rules. Letter from John Morrissey (Nov. 2, 1994) at 1-2, reprinted in J.A. at 211-12.

Coplin appealed the decision on November 10, 1994, and the FPATV Committee set a hearing for December 1, 1994. At the hearing, Coplin responded to the FPATV Committee's allegations. FPATV Committee members then introduced additional allegations during the latter part of the meeting, but Coplin was not allowed to respond to these allegations. The meeting was continued until December 7, 1994, so that the new allegations could be more fully

discussed.  Coplin attended the second meeting, but was not allowed to participate.

The FPATV Committee voted to sanction Coplin for the live call-in segment.  The FPATV Committee sent Coplin a letter informing him that the FPATV Committee had decided to suspend him "in whole from the station for six (6) months from December 7, 1994, after which he will be eligible to apply for reinstatement through a hearing with the FPATV Committee." Letter from Robert Glocke, Chairman of FPATV Committee (Dec. 19, 1994) at 2, reprinted in J.A. at 302.

Coplin appealed the FPATV Committee's decision to the City Council, which heard arguments on Coplin's appeal.  The Council voted to uphold the six-month suspension, but modified the term to begin on November 1, 1994, rather than December 7, 1994.  Coplin brought this § 1983 action in the district court against the FPATV Committee and the Council, seeking injunctive relief, declaratory relief, monetary damages, and attorney's fees.

The FPATV Committee and the Council moved to dismiss Coplin's claim for monetary damages and attorney's fees.  See Partial Mot. to Dismiss (May 22, 1995), reprinted in Jt. Supp. App. at 354.  The FPATV Committee and Council filed a brief in support of their motion, and Coplin responded with a brief resisting the partial motion to dismiss.  The district court denied the partial motion to dismiss without prejudice.  Order (July 3, 1995), reprinted in Jt. Supp. App. at 373.

The district court then bifurcated the action between the liability and damages phases.  With the agreement of the parties, the district court ordered that "[t]he first phase of a bifurcated trial, a bench trial encompassing the issues on which plaintiff

seeks declaratory and injunctive relief, will be held before [a magistrate judge]" and that "[t]he second phase of trial, a jury trial on any valid monetary damage claims, will be scheduled for a later date, if necessary." Id.

After the magistrate judge set a date for the bench trial, both sides moved for summary judgment on Coplin's claims for injunctive and declaratory relief. With respect to Coplin's claims for monetary damages and attorney's fees, none of the parties moved for summary judgment or presented arguments to the magistrate judge.

The magistrate judge granted summary judgment to the FPATV Committee and the Council on Coplin's claims for injunctive and declaratory relief. In addition to rejecting several other arguments raised by Coplin, the magistrate judge concluded that "if the statements about the sexual habits of the residents of [the Trailer Park Residence] and possible extramarital affair at [the Second Street Residence], and masturbation habits of a caller were true, [Coplin's] broadcast was an invasion of privacy." Mem. Op. at 15 (emphasis in original) (citing Iowa case law). In the alternative, the magistrate judge concluded that "[i]f the statements were untrue, then [Coplin's] broadcast was defamatory." Id. (emphasis in original) (citing Iowa case law). The magistrate judge therefore concluded that "Coplin's statements broadcast on the 'Sex Survey' show were not constitutionally protected speech and were subject to sanction without

violating his constitutional rights."  Id.[2]  In addition, the magistrate judge ruled that 47

---

[2]The magistrate judge apparently concluded that, regardless of whether the statements cablecast on Coplin's show were true or false, Coplin committed a state-law tort and that, as a result, Coplin's speech was unprotected.  We recognize that the United States Supreme Court has shown a certain degree of deference for state regulation of tortious speech.  See, e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974) (holding that, consistent with the First Amendment, "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual").  Nevertheless, speech constituting a state-law tort is not necessarily unprotected speech.  As the Supreme Court has made clear, states may not regulate speech merely because the speech is defined as a state-law tort.  See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964) (holding that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct").

U.S.C. § 555a(a) precludes Coplin from recovering monetary damages and attorney's fees in this action.  Coplin appeals.

## II.

Coplin argues that his First Amendment rights were violated because the FPATV Committee and the Council regulated his speech on the basis of its content.  The FPATV Committee and Council counter that their actions were permissible because Coplin engaged in speech that can be regulated based on its content.[3]  Because we do not agree that the FPATV Committee and the Council are entitled to judgment as a matter of law, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this decision.

---

[3]The FPATV Committee and the Council have not attempted to justify the regulation on the basis of the need to protect children from patently offensive sex-related material.  See Denver Area Educ. Telecom. Consortium, Inc. v. F.C.C., 116 S. Ct. 2374, 2386 (1996) (discussing the permissibility of regulating patently offensive sex-related material that is easily accessible to children).  Nor does the record indicate the degree to which Coplin's show was accessible to children.  Accordingly, we do not reach the issue of whether Coplin's show could be regulated, consistently with the First Amendment, in order to protect children.

We review a grant of summary judgment de novo. <u>McCormack v. Citibank, N.A.</u>, 100 F.3d 532, 537 (8th Cir. 1996). Summary judgment is only appropriate where the record presents "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The record must be viewed in the light most favorable to the party against whom summary judgment was granted. <u>See</u> <u>McCormack</u>, 100 F.3d at 534.

"The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992) (citations omitted). Thus, because Coplin was banned from FPATV for the content of his show, the actions of the FPATV Committee and the Council are presumptively invalid.

This presumption is not irrebuttable, however. "[O]ur society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" <u>Id.</u> at 382-83 (quoting <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942)). Because these limited areas of speech, which include, for example, obscenity, are of such slight social value, "[they] can, consistently with the First Amendment, be regulated <u>because of their constitutionally proscribable content</u> . . . ." <u>Id.</u> at 383 (emphasis in original).

These categories of speech are not, however, "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their

-11-

distinctively proscribable content." Id. at 383-84.  Therefore, although the government can regulate such areas of speech on the basis of content, that regulation must be viewpoint-neutral.  Id. at 384 ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government." (emphasis in original)).[4]

_____

[4]In addition, the standards that apply to the governmental regulation of speech ordinarily vary depending on the forum in which the regulated speech is delivered.  Thus, "control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 392-93 (1993) (quotations, citations, and alteration omitted).  However, to control access to a designated public forum, the government must be able to show a compelling governmental interest for its restrictions.  See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 800 (1985).

Because the Council designated that FPATV was "available to any resident of the City of Fairfield and its surrounding cable broadcast areas," FPATV Rule I(A), reprinted in J.A. at 340 (emphasis added), we would ordinarily conclude, under a standard forum analysis, that FPATV was a designated public forum.  However, the recent decision of a deeply divided Court in Denver Area Educ. Telecom. Consortium, Inc. v. F.C.C., 116 S. Ct. 2374 (1996), has cast some doubt on the appropriateness of this analysis.  The Denver Area Court addressed "First Amendment challenges to three statutory provisions that seek to regulate the broadcasting of 'patently offensive' sex-related material on cable television," id. at 2380, including public access channels like FPATV.  In a plurality opinion joined by Justices Stevens, O'Connor, and Souter, Justice Breyer cautioned that:

> [T]he First Amendment embodies an overarching commitment to protect speech from Government regulation through close judicial scrutiny, thereby enforcing the Constitution's constraints, but without imposing judicial formulae so rigid that they become a straightjacket that disables Government from responding to serious problems. This Court, in different contexts, has consistently held that the Government may directly regulate speech to address extraordinary problems, where its regulations are appropriately tailored to resolve those problems without imposing an unnecessarily great restriction on speech.

In the present action, the magistrate judge concluded that Coplin's speech could be regulated on the basis of content if the speech constituted either an invasion of privacy or defamation. The magistrate judge then held as a matter of law that the statements made on Coplin's show were, if true, an invasion of

---

Justices Kennedy and Thomas would have us further declare which, among the many applications of the general approach that this Court has developed over the years, we are applying here. But no definitive choice among competing analogies (broadcast, common carrier, bookstore) allows us to declare a rigid single standard, good for now and for all future media and purposes. . . . [A]ware as we are of the changes taking place in the law, the technology, and the industrial structure, related to telecommunications, we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now. We therefore think it premature to answer the broad [question] . . . whether public access channels are a public forum . . . .

Id. at 2385 (citations omitted).

Justice Kennedy, who wrote separately and was joined by Justice Ginsburg, found "the most disturbing aspect of [Breyer's] plurality opinion" to be "its evasion of any clear legal standard in deciding [the] case." Id. at 2405. Similarly, Justice Thomas, joined by the Chief Justice and Justice Scalia, characterized the plurality's opinion as "deciding not to decide on a governing standard" and faulted the plurality for "openly invit[ing] balancing of asserted speech interests to a degree not ordinarily permitted." Id. at 2422.

We would agree that, at least with respect to the appropriate analysis that should be applied in the present action, the plurality's opinion seems somewhat enigmatic. Nevertheless, after closely reviewing the structure of FPATV, we hold that the FPATV Committee and the Council have sufficiently opened FPATV to the citizens of Fairfield and the surrounding broadcast area that control over access cannot be based on subject matter or speaker identity, at least insofar as the speaker is a citizen of Fairfield or the surrounding broadcast area. Furthermore, we hold that the FPATV Committee and the Council have neither alleged nor proven "extraordinary problems," see id. at 2385, that would justify barring Coplin from using FPATV.

-13-

privacy and, if false, defamation.  On this basis, the magistrate judge granted the FPATV Committee's and Council's motion for summary judgment.

Because the magistrate judge made no factual findings with respect to the truthfulness and accuracy of the statements made on Coplin's cablecast, the magistrate judge's grant of summary judgment was dependent on Coplin's speech being an invasion of privacy, if true, and defamation, if false.  As a result, we cannot affirm the magistrate judge's decision unless this Court can rule as a matter of law both (1) that the statements are a constitutionally proscribable invasion of privacy if true and (2) that the statements are constitutionally proscribable defamation if false. If either one of these two prongs of analysis cannot be satisfied, the FPATV Committee and Council are not entitled to judgment as a matter of law.  Because this Court can reach neither conclusion as a matter of law, we conclude that summary judgment was inappropriate.  Accordingly, we reverse the district court's grant of summary judgment.

**A.**

The magistrate judge held that, if Coplin's speech were true, it constituted an invasion of privacy under Iowa law and could therefore be regulated consistently with the First Amendment.  Iowa recognizes an action in tort for the invasion of privacy and, like many states, has drawn the elements of this action from the Second Restatement of Torts.  See Stessman v. American Black Hawk Broad. Co., 416 N.W.2d 685, 686 (Iowa 1987).  Under Iowa law, as relevant here, "'[t]he right of privacy is invaded by . . . unreasonable intrusion upon the seclusion of another . . . [or] unreasonable publicity given to the other's private life . . . .'"  Id. (quoting

-14-

Restatement (Second) of Torts § 652A(2) (1977)).  These actions are subject to certain limitations, however, that are informed by First Amendment concerns.  See Howard v. Des Moines Register & Tribune Co., 283 N.W.2d 289, 297-98 (Iowa 1979).  In general, a plaintiff cannot bring an action for an invasion of privacy if a reasonable person would not find the intrusion highly offensive, the facts revealed are already in the public domain, or the matter publicized is a legitimate concern of public interest.  See Stessman, 416 N.W.2d at 686-87; Howard, 283 N.W.2d at 298; Winegard v. Larsen, 260 N.W.2d 816, 822-23 (Iowa 1978).

As the Supreme Court has recognized, there is "tension between the right which the First Amendment accords to free press, on the one hand, and the protections which various statutes and common-law doctrines accord to personal privacy against the publication of truthful information, on the other . . . ."  The Florida Star v. B.J.F., 491 U.S. 524, 530 (1989).  Yet neither the Supreme Court nor this Circuit has set forth a general standard to determine when speech that reveals truthful facts about private individuals can be regulated, consistently with the First Amendment.  Indeed, the Supreme Court has declined several invitations to do so.  See, e.g., id. at 532 (declining "appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment" and noting that "[o]ur cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily"); Cox Broad. Corp. v. Cohn, 420 U.S. 469, 491 (1975) ("Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is

-15-

appropriate to focus on the narrower interface between press and privacy that this case presents . . . .").

Although the Supreme Court has declined to reach this issue, we agree with the Seventh Circuit that the Court was not "being coy in <u>Cox</u> or <u>Florida Star</u> in declining to declare the tort of publicizing intensely personal facts totally defunct." <u>Haynes v. Alfred A. Knopf, Inc.</u>, 8 F.3d 1222, 1232 (7th Cir. 1993). Instead, after reviewing Supreme Court precedent and the decisions of other circuits that have faced the tension between the First Amendment's protection of free speech and state-law actions in tort for the invasion of privacy, we conclude that speech that reveals truthful and accurate facts about a private individual can, consistently with the First Amendment, be regulated because of its constitutionally proscribable content. <u>See, e.g.</u>, <u>Gilbert v. Medical Econ. Co.</u>, 665 F.2d 305, 308 (10th Cir. 1981) ("[D]issemination of non-newsworthy private facts is not protected by the first amendment."); <u>cf.</u> <u>Haynes</u>, 8 F.3d at 1232 ("The Court must believe that the First Amendment greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people want very much to conceal.").

We also hold, however, that such regulation is subject to substantial limitations. Only in the "extreme case" is it constitutionally permissible for a governmental entity to regulate the public disclosure of facts about private individuals. <u>See</u> <u>Gilbert</u>, 665 F.2d at 308. In order to insure that this form of regulation is limited to the extreme case, courts have imposed four constitutionally mandated restrictions on the regulation of the public disclosure of private facts. The first and most fundamental restriction is that such regulation must be viewpoint-neutral. <u>Cf.</u> <u>R.A.V.</u>, 505 U.S. at 384 ("[T]he government may proscribe libel; but

-16-

it may not make the further content discrimination of proscribing <u>only</u> libel critical of the government." (emphasis in original)).

Second, to censure an individual for the dissemination of facts about a private individual, the facts revealed must not already be in the public domain. <u>Cf.</u> <u>The Florida Star</u>, 491 U.S. at 541 (holding that a newspaper could not be held liable for publishing the name of a rape victim which it had lawfully obtained from a publicly released police report because "where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order"); <u>Cox</u>, 420 U.S. at 491 (holding that the State may not "impose sanctions on the accurate publication of the name of a rape victim obtained from public records--more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection" notwithstanding the desire of the victim's family to prevent disclosure of the victim's name).

Third, the facts revealed about the otherwise private individual must not be the subject of legitimate public interest. <u>See</u> <u>Time Inc. v. Hill</u>, 385 U.S. 374, 388 (1967) ("The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (citations and quotations omitted)); <u>Haynes</u>, 8 F.3d at 1232 ("People who do not desire the

limelight and do not deliberately choose a way of life or course of conduct calculated to thrust them into it nevertheless have no legal right to extinguish it if the experiences that have befallen them are newsworthy, even if they would prefer that those experiences be kept private."); Gilbert, 665 F.2d at 308 ("[T]he first amendment protects the publication of private facts that are 'newsworthy,' that is, of legitimate concern to the public."); Campbell v. Seabury Press, 614 F.2d 395, 397 (5th Cir. 1980) (per curiam) (The First Amendment privilege for the public disclosure of facts "extends to information concerning interesting phases of human activity and embraces all issues about which information is needed or appropriate so that individuals may cope with the exigencies of their period.").

Finally, for regulation to be permissible, the facts revealed must be highly offensive. See Haynes, 8 F.3d at 1234-35 (noting in a suit for invasion of privacy that "[t]he core . . . of privacy law . . . is the protection of those intimate physical details the publicizing of which would not be merely embarrassing and painful but deeply shocking to the average person subjected to such exposure"); Gilbert, 665 F.2d at 307 ("In attempting to strike an acceptable balance between [First Amendment privileges and the invasion of privacy], liability may be imposed for publicizing matters concerning the private life of another if the matter publicized is the kind that . . . would be highly offensive to a reasonable person . . . ." (quotations omitted)); Campbell, 614 F.2d at 397 ("[T]he inquiry in determining the applicability of the [First Amendment] privilege [of broadcasting news of public interest concerning private figures] focuses on the information disclosed by publication and asks whether truthful information of legitimate concern to the public is publicized in a manner that is not highly offensive to a reasonable person.").

In sum, absent a compelling state interest, speech that reveals truthful and accurate facts about a private individual can be regulated, consistently with the First Amendment, because of its constitutionally proscribable content only if: (1) any such regulation is viewpoint-neutral; (2) the facts revealed are not already in the public domain; (3) the facts revealed about the otherwise private individual are not a legitimate subject of public interest; and (4) the facts revealed are highly offensive. Accordingly, to avoid violating an individual's rights under the First Amendment, governmental regulation of the public disclosure of facts about private individuals must satisfy all four of these requirements.

In the present action, based on the record before us, we cannot rule as a matter of law that all four restrictions have been satisfied. While we agree with the magistrate judge that the Committee's actions were viewpoint neutral, see Mem. Op. at 13, genuine issues of material fact remain with respect to the other three factors.

We cannot determine as a matter of law that the information revealed on Coplin's show was not already in the public domain because this determination is inherently fact-intensive and we do not have the necessary facts before us. Indeed, we strongly suspect that the report on Coplin's show that a green truck regularly parks on a Fairfield city street at midday is not private information. Moreover, it is an open question whether the sexual practices of the Trailer Park Residence occupants were in the public domain. If the neighbors of that residence could readily view the sexual activity occurring there, it is not inconceivable that the sexual activities were so openly performed that knowledge of these activities was already in the public domain.

-19-

We have similar concerns about the remaining factors. Although we agree that, in most circumstances, holding up the sexual activities of a specific private individual to public ridicule is not a legitimate concern of public interest and that doing so is highly offensive, the record reveals nothing about the identity of the occupants of the residences in question. The magistrate judge's decision implicitly assumes that the occupants of the Trailer Park Residence and the Second Street Residence were private individuals. If these individuals were instead public figures or public officials, then the public dissemination of truthful and accurate facts about them would almost certainly have been protected by the First Amendment. Cf. Garrison v. Louisiana, 379 U.S. 64, 72-73 (1964) ("In any event, where the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth."). Because we know nothing of the individual or individuals living at the Trailer Park Residence and nothing of the individual or individuals living at the Second Street Residence, we cannot rule as a matter of law that the information revealed on Coplin's show was not a legitimate concern of public interest or that it was highly offensive.

The FPATV Committee and Council have submitted no evidence that the facts are not already in the public domain, that the facts revealed are not a legitimate concern of public interest, and that the facts are highly offensive. Indeed, they have not even alleged that these elements have been met. As a result, the FPATV Committee and Council have failed to rebut the presumption that

their content-based regulation of Coplin's show was invalid.  See R.A.V., 505 U.S. at 382.[5]

**B.**

The magistrate judge also held that, if Coplin's speech were untrue, it was defamatory and hence could be regulated consistently with the First Amendment.  As defined under Iowa law, "[d]efamation involves the publication of written or oral statements which tend to injure a person's reputation and good name."  Kerndt v. Rolling Hills Nat'l Bank, 558 N.W.2d 410, 418 (Iowa 1997).  We agree that defamation of a private individual is a form of speech that can be regulated because of its constitutionally proscribable content.  See R.A.V., 505 U.S. at 383.

However, such regulation must be viewpoint-neutral.  See id. at 383-84.  Moreover, defamation of a public figure is not a form of speech that can be regulated because of its content unless there is "clear and convincing evidence" that the defamatory statement was made "with actual malice, i.e. with knowledge that it was false or with reckless disregard of whether it was false or not."  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991); see also New York Times Co. v. Sullivan, 376 U.S. 254, 282 (1964).

---

[5]In addition, we cannot rule as a matter of law that Coplin invaded the privacy of the caller whose alleged masturbation habits were ridiculed.  The caller was never identified by name or by address.  Coplin and his co-host merely questioned whether the caller might be "someone on the board."  Fairfield Speaks Tr. (Oct. 24, 1994) at 12, reprinted in J.A. at 170.  There is also no indication in the record that the caller's voice was recognizable to Coplin or to members of the viewing audience.  Consequently, it is impossible to conclude as a matter of law that the privacy of this individual was invaded in any meaningful sense.

-21-

Again, from the record before us, we cannot determine as a matter of law whether the individuals held up for scorn were public or private figures. The FPATV Committee have neither alleged nor provided any evidence that these individuals are private individuals. Moreover, the FPATV Committee and the Council have neither alleged nor presented "clear and convincing" evidence that Coplin knowingly or recklessly defamed any of the individuals ridiculed on his program. As a result, it was inappropriate to rule as a matter of law that Coplin's speech, if false, was constitutionally proscribable defamation.

## C.

Even if we could rule as a matter of law that the statements made on Coplin's show were an invasion of privacy if true and defamation if false, summary judgment for the FPATV Committee and the Council members would still not necessarily be appropriate. Coplin has raised several other First Amendment contentions on appeal that may preclude summary judgment.[6] Because we remand for further fact-finding, we need not address any other issue raised here on appeal. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) ("The Court will not anticipate a question of constitutional law in advance of the

---

[6]Coplin argues on appeal that: (1) the FPATV Committee and the Council must allege and prove a compelling governmental interest to prohibit him from using FPATV; (2) Coplin cannot be held liable for the speech of the callers on his show; (3) the First Amendment forbids holding speakers liable for statements, like the ones made on his show, that cannot reasonably be taken as factual; (4) the Council's administrative regime for policing speech on FPATV impermissibly gives political officials unconstrained and unreviewed authority to censor; (5) the FPATV Committee's order barring Coplin from FPATV is an unconstitutional prior restraint on speech; and (6) the FPATV Committee's ban is not narrowly tailored to the limited interest of regulating tortious speech.

necessity of deciding it." (quotations and citations omitted)); see also Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501 (1985) ("We call to mind two of the cardinal rules governing the federal courts: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (quotations, citations, and alteration omitted)).

**III.**

Coplin challenges the magistrate judge's holding that he is not entitled as a matter of law to monetary damages under 47 U.S.C. § 555a(a). He argues that the magistrate judge's decision on this issue was procedurally improper because the magistrate judge was only supposed to rule on matters of declaratory and injunctive relief in the first phase of Coplin's bifurcated suit. However, because Coplin's allegations of monetary damages and attorney's fees fail to state a claim upon which relief may be granted, any procedural error that the magistrate judge may have committed by ruling that Coplin is not entitled to monetary damages is harmless.

A district court can grant summary judgment sua sponte as long as the "party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted." Madewell v. Downs, 68 F.3d 1030, 1048 (8th Cir. 1995) (quotations and citations omitted). However, even where the party against whom judgment was entered is not notified and is not given a chance to respond to a motion to dismiss, this Court can uphold a district court's grant of summary judgment if the losing party has failed to state a claim upon which relief may be granted. See Phelps v.

<u>United States Federal Government</u>, 15 F.3d 735, 739 (8th Cir. 1994) (holding that, even though the district court granted summary judgment improperly because (1) it failed to notify the habeas petitioner of its intention to treat a motion to dismiss as a motion for summary judgment, (2) it failed to give the petitioner an opportunity to respond to the motion, and (3) the record did not support summary judgment, any error was harmless because the petitioner failed to state a claim upon which relief could be granted).

Because § 555a(a) limits Coplin's potential recovery in this action to declaratory and injunctive relief, Coplin's allegations that he is entitled to monetary damages and attorney's fees fail to state a claim upon which relief may be granted.  Section 555a(a) provides:

> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a(a).

Coplin's sole argument that § 555a(a) does not bar his recovery of monetary damages and attorney's fees is that the actions taken by the FPATV Committee and the Council members did not "aris[e] from the regulation of cable service."  <u>Id.</u>  Pointing to the legislative history of the Cable Act, he argues that § 555a(a) was intended only to prevent cable operators from

recovering damages for franchising decisions, but not to prevent producers of cable shows from recovering damages for the infringement of First Amendment rights.  We disagree.

We need not interpret the legislative history of the Cable Act because its statutory language is clear.  See Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); Barnhill v. Johnson, 503 U.S. 393, 401 (1992) (noting that "appeals to legislative history are well taken only to resolve 'statutory ambiguity'"); United States v. Union Elec. Co., 64 F.3d 1152, 1165 (8th Cir. 1995) ("The task of resolving the dispute over the meaning of a statute begins where all such inquiries must begin: with the language of the statute itself. . . . Thus, courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quotations, citations, and alteration omitted)).

Under the plain language of the statute, Coplin's action "aris[es] from the regulation of cable service."  47 U.S.C. § 555a(a).  At the heart of Coplin's action is a dispute over the regulation of cable service: he brings an action disputing a governmental entity's right to regulate the content carried on a public access cable service.  As a result, Coplin's action arises from the regulation of cable service within the meaning of § 555a(a).[7]

---

[7]We also note that, even if we were to reach the legislative history of the Cable Act, it would offer little support for Coplin's argument.  Although Congress was concerned with the possibility that local authorities would be subject to overwhelming monetary damages in suits by cable operators over franchising decisions, see, e.g., S. Rep. No. 102-92, at 48-50 (1992), reprinted in 1992 U.S.C.C.A.N., Vol. 4, at 181-83, the legislative history does not suggest that disputes over franchising decisions were the only concern that Congress intended to address in enacting § 555a(a).

-25-

**IV.**

For the foregoing reasons, with respect to Coplin's claims for injunctive and declaratory relief, we reverse and remand for further proceedings in accordance with this opinion.  With respect to the magistrate judge's ruling that Coplin is not entitled to monetary damages, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.